FREDERICK F. TUSCAN ET ALS *vs*. CLYDE H. SMITH ET ALS.

Somerset.      Opinion January 23, 1931.

*Harry R. Coolidge*, for plaintiffs.
*Gower & Eames*, for Blin W. Page.
*Merrill & Merrill*,
*Belleau & Belleau*,
*George C. Wing, Jr.*, for defendants.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, THAXTER, JJ.

THAXTER, J. This case is before this court on appeal by certain defendants from a decree of a sitting Justice sustaining the plaintiffs' bill in equity.

The bill is brought by ten taxable inhabitants of the Town of Skowhegan seeking cancellation of a lease given by the town to the defendant Myron E. Smith, and by him assigned to the defendant Priscilla Theatres, Inc., and among other prayers asks for an injunction against the lessee or his assignee taking possession of the demised premises. Joined as defendants with the lessee Myron E. Smith are his assignee, Priscilla Theatres, Inc., J. Nazaire Theriault, who received an assignment of the lease from the theatre company as security for his endorsement on certain notes, Clyde H. Smith, a brother of Myron and chairman of the selectmen of the Town of Skowhegan, Frances Smith, wife of Myron, the remaining two selectmen of the town, and the town itself. The claim of the bill as amended is that a lease dated October 19, 1929, of a portion of the municipal building to Myron E. Smith is void, because knowingly made for a less rental than could have been obtained from other parties and because Clyde H. Smith, one of the selectmen, was pecuniarily interested in the granting of the lease and in the assignment of it. The bill sets forth the following circumstances as evidence of such interest, that Clyde H. Smith was a part owner with his brother in the picture business to be conducted on the premises, that he was liable on guarantees given by his brother to one from whom his brother had purchased an outstanding interest in the business, and that he was a creditor of his brother in a substantial amount. The bill charges that the assignees of the lease had knowledge of these facts. The answers of the various defendants deny these allegations with the exception that they admit the guarantee and an indebtedness of Myron E. Smith to his brother, which was paid by notes received from Priscilla Theatres, Inc., as part of the price for the assignment of the lease and the sale of the business. The answers also set forth that the form of the lease had the approval of the voters of the town, that a request for bids was suitably advertised, and that only one bid was received, that of Myron E. Smith and Rexford St. Ledger.

The evidence shows the following facts. Prior to March, 1929,

Myron E. Smith and Grace St. Ledger were the lessees of a portion of the municipal building of the Town of Skowhegan. In the leased premises they operated a moving picture business. This lease expired February 20, 1930. At the annual town meeting in March, 1929, the town ordered its selectmen to prepare a blank form for a new lease and submit it to the town for approval, and directed the selectmen to award the lease to local parties if they would meet the terms of outsiders. On June 8 this draft of a lease was submitted to the town voters and approved. It provided for the letting of that part of the municipal building used as a moving picture theatre, for a term of ten years at a rental of twelve dollars a year. The lessee was, however, to heat and light the whole building, and to furnish janitor service for it and for the surrounding grounds. The lease provided in considerable detail how this work should be done. All of these services were to be performed to the satisfaction of the selectmen of the town. In addition, the standard and quality of the pictures to be shown were subject to the approval of a board of five censors to be chosen by the selectmen. There were numerous other covenants to be performed by the lessee, which it is unnecessary to mention. Proposals for bids were duly published and but one bid was received, a joint bid from Myron E. Smith and Rexford St. Ledger, the son of Grace St. Ledger, lessee with Myron of the existing lease. The new lease was to run for ten years from February 20, 1930, the date of the expiration of the old lease. For some reason not satisfactorily explained the new lease was not actually executed till October 19, on which day also Rexford St. Ledger, with the approval of the selectmen, assigned his interest under the bid to Myron E. Smith. That very day negotiations started between Myron E. Smith and Priscilla Theatres, Inc., for the purchase by the latter of Myron's business. Ten days later Myron bought out Mrs. St. Ledger's interest in the balance of the old lease and her interest in the business, and gave her an agreement to save her harmless on any partnership debts. Clyde Smith guaranteed his brother's performance of this obligation. The negotiations were finally closed with Priscilla Theatres, Inc., about the middle of November. The purchaser received from Myron E. Smith an assignment of the

balance of the old lease, an assignment of the new lease which was approved by Clyde Smith and Joseph Butler, two of the three selectmen, a bill of sale of certain of the equipment, and an assignment of Myron Smith's interest in certain motion picture contracts. For this ten thousand dollars was paid, two thousand dollars in cash and the balance by four notes payable in one, two, three, and four years, with interest at five per cent. These notes were endorsed by Mr. Theriault, the treasurer of the purchasing company. The evidence does not show that Clyde Smith was an owner in the business, but at the time of this sale and for a long period of time prior thereto, Myron Smith had been indebted to his brother in the sum of four thousand dollars, and shortly after the sale this indebtedness was discharged by Myron turning over to Clyde notes of the Priscilla Theatres, Inc., to the amount of three thousand dollars. One of the notes was split to enable this to be done. It is important to bear in mind that Clyde Smith took an important part in the negotiations between his brother and the purchaser. His brother was nervous and in ill health. Clyde advised him as the deal progressed. When misunderstandings arose, it was on Clyde's suggestion that his brother gave in. Clyde insisted on the indorsement of the notes. He was present at the first interview, October 19, between his brother and Mr. Dam, the representative of the purchaser, and was a participant in the discussion of the terms of the sale. It is a fair inference from the evidence that he was his brother's confidant and advisor in business matters. Clyde Smith had been for many years a member of the board of selectmen of the Town of Skowhegan, and at the time of these negotiations and the filing of the bill in this case was chairman of the board.

The question before this court now is whether on these facts the sitting Justice was warranted in sustaining the plaintiffs' bill, and in holding void the lease given by the town to Myron E. Smith. A question of jurisdiction should be settled at the outset.

At the time that Maine became a separate state in 1820 the Supreme Judicial Court was not granted general equity powers. The first laws on the subject passed in 1821 followed the Massachusetts acts, and gave jurisdiction in certain specified cases. From time to time this was enlarged, but this court has always

held that it had no equity powers except in so far as they may have been given by legislative enactment. Among such statutory extensions of jurisdiction were acts giving a remedy in equity in certain cases involving unauthorized doings by cities and towns. These are found in the R. S. 1916, Chap. 4, Secs. 42, 43, 44, and Chap. 82, Sec. 6, XIII.

Chap. 82, Sec. 6, XIII, reads as follows:

"XIII. When counties, cities, towns, school districts, village or other public corporations, for a purpose not authorized by law, vote to pledge their credit or to raise money by taxation or to exempt property therefrom, or to pay money from their treasury, or if any of their officers or agents attempt to pay out such money for such purpose, the court shall have equity jurisdiction on petition or application of not less than ten taxable inhabitants thereof, briefly setting forth the cause of complaint."

This provision was first enacted in 1864, Chapter 239, Public Laws 1864, and has come down to us today in practically its original language with the exception that the words "or to exempt property therefrom" were not included in the original act. These first appear in the revision of the statutes of 1883.

Chap. 4, Secs. 42, 43, and 44, R. S. 1916, read as follows:

*"Sec. 42. Town officers not to act when pecuniarily interested. R. S. c. 4, sec. 38.* No member of a city government or selectmen of a town, shall in either board of such government, or in any board of selectmen, vote on any question in which he is pecuniarily interested directly or indirectly, and in which his vote may be decisive; and no action of such government or board taken by means of such vote, is legal.

*"Sec. 43. Interests in municipal contracts prohibited. R. S. c. 4, sec. 39.* No member of a city government shall be interested, directly or indirectly, in any contract entered into by such government while he is a member thereof; and contracts made in violation hereof are void.

"*Sec. 44. Enforcement of secs. 42 and 43. R. S. c. 4, sec.* 40. The supreme judicial court in equity, by writ of injunction or otherwise, may restrain proceedings in any town in violation of the two preceding sections, upon application of ten or more taxable citizens."

These provisions were originally passed in 1868. Chapter 162, Public Laws 1868. In substance they are identical with the original enactments. In place of the words used in Section 42 of the 1916 Revision "no action of such government or board taken by means of such vote is legal" the original act reads as follows: "no action of any city government or board of selectmen hereafter taken by means of a vote forbidden by the provisions of this act shall be legal." The meaning of these two provisions is, however, the same. Section 43 is practically identical with Section 2 of the original act. Section 3 of the original enactment, which relates to the remedy, provides that it shall be the same as in Chapter 239 of the Public Laws of 1864 above referred to. In the Revision of 1871 this section received its present form. R. S. 1871, Chap. 3, Sec. 30. Counsel for the defendants in their very able discussion of the history of this legislation comment on the fact that an inference might be drawn from the use of the word "town" in Section 44 that both of the preceding sections apply equally to towns. We quite agree with them, however, that this is not so, and that Section 43 has reference merely to cities. The use of the word "town" in the section relative to the remedy is general and is intended to include both cities and towns. R. S. 1916, Chap. 1, Sec. 6, Paragraph XIX.

The discussion of the history of this legislation is important in order to determine what, if any, remedy these plaintiffs may have apart from these express provisions of the statutes providing for relief in equity against cities and towns, for, contrary to the contention of plaintiffs' counsel, none of these statutory provisions is in our opinion applicable to the instant case. Sec. 42, Chap. 4, does not apply because the action taken by the board of selectmen of the Town of Skowhegan was not taken by means of the vote of the defendant, Clyde H. Smith. The vote was unanimous and he was but one of three. *Marshall* v. *Ellwood City*, 189 Pa. St., 348. Section 43

is inapplicable because Skowhegan is a town and not a city, and this section applies only to city governments. It is likewise obvious that the attempted action of the town is not within the prohibitions of Section 6, XIII, of Chapter 82.

Counsel for defendants contend that, even assuming the contract in this case might have been void at common law, yet the statute, passed in 1868 referred to above, removes such common law restriction, except in so far as the prohibitions of the statute may apply. With this contention we do not agree. At the time of the passage of this act and likewise of the act of 1864, the general equity power of this court was still limited. Only in so far as the statutes authorized it did it have equity jurisdiction. It was not until 1874 that general equity jurisdiction was given. Public Laws 1874, Chapter 175. The statutes of 1864 and 1868 did not therefore in any sense purport to enumerate those acts of cities and towns which were illegal and void to the exclusion of all others, but merely extended a remedy in equity for the acts therein prohibited. What had theretofore been unlawful at common law was still unlawful.

In 1874 the Supreme Judicial Court was given full equity powers, and since that time equitable remedies have been available to taxable inhabitants against cities and towns, except in so far as considerations of public policy and the discretionary powers of the courts may restrict them. It has always been conceded that the attorney general in the name of the state or on the relation of interested parties could bring a bill in equity in a case properly within the equity jurisdiction of the court to set aside illegal acts of municipal corporations. Dillon: Municipal Corporations, 5 ed., Sec. 1577. Some cases have held that the attorney general is a necessary party and that a taxable inhabitant in his own name has no right to institute an action, where the act complained of is one which affects the entire public equally. *Davis* v. *New York*, 2 Duer (N. Y.), 663; *Miller* v. *Grandy*, 13 Mich., 540. It must be conceded that there is reason back of such a restriction. Municipal officers should not be subjected to litigation at the suit of every dissatisfied taxpayer. By the weight of authority today, however, taxable inhabitants are not barred from maintaining a bill in their

own names in a proper case. *Crampton* v. *Zabriskie*, 101 U. S., 601. In this case the Court said, page 609:

> "Certainly in the absence of legislation restricting the right to interfere in such cases to public officers of the State or county; there would seem to be no substantial reason why a bill by or on behalf of individual tax payers should not be entertained to prevent the misuse of corporate powers. The courts may be safely trusted to prevent the abuse of process in such cases."

Our court has very clearly defined the limits of such right. It has held that it should be restricted to an application for preventive relief, and that individual taxpayers have not the right to apply for remedial relief after the commission of an illegal act, where the act is one which affects the entire community and not specifically the individual bringing the bill. *Eaton* v. *Thayer*, 124 Me., 311.

We are aware that Massachusetts has held that the statute conferring general equity powers on its courts did not give the right to the individual taxpayer to file a bill. *Baldwin* v. *Inhabitants of Wilbraham*, 140 Mass., 459; *Steele* v. *Municipal Signal Co.*, 160 Mass., 36; *Prince* v. *Crocker*, 166 Mass., 347. It is perhaps sufficient to say that this court has construed our own statute differently. *Blood* v. *Beal*, 100 Me., 30; *Reynolds* v. *Waterville*, 92 Me., 292; *Eaton* v. *Thayer*, supra.

If therefore the action of the selectmen of the Town of Skowhegan in giving the lease here in question to Myron E. Smith was void under the principles of the common law, this court has jurisdiction in equity to enjoin the wrongful use by the lessee of the town property, to declare such contract void, and as incidental to such preventive measures to give such affirmative relief as may be appropriate.

The testimony in this case shows that Myron Smith had been indebted to his brother Clyde for a long period of time; and it is a reasonable inference from all that went on between them that this indebtedness he was unable to pay except through the sale or successful operation of his moving picture business. He was a victim of

misfortune, of physical and mental illness. It was Clyde Smith who apparently prevented the deal between Myron and the Priscilla Theatres from falling through, and he assumed an active role in the negotiations. Conceding with defendants' counsel that mere indebtedness does not necessarily create an interest in fact in the business transactions of the debtor, yet it may do so; and in view of the circumstances of this case, we feel that Clyde Smith's pecuniary interest in the outcome of this affair was obvious. In determining whether or not a contract such as this is against public policy and illegal the court is not concerned with the technical relationships of the parties, but will look behind the veil which enshrouds the matter to discern the vital facts.

The inevitable consequence of the form of the lease here in question was to limit the number of bidders for it. The rent was payable not in money but in services, and one of the judges as to whether those services should be properly rendered was the chairman of the selectmen of the town. Tolerance there meant more profit to the lessee, and more money with which to pay his brother's debt. Moreover, the standard and quality of the pictures were subject to the decision of a board of censors appointed by the selectmen, who were themselves a final board of appeal. The conflict of interest between Clyde Smith as a town official and Clyde Smith as his brother's creditor is apparent, and the approval of the lease by the voters of the town can not alter the fact. When we consider the control which the selectmen had over the business of the lessee, their wide latitude in determining whether he had or had not performed the covenants of his lease, that they held a practical censorship over the pictures which he might show, that in fact they had it in their power to decree whether his business should run at a profit or at a loss, we can well understand that there might be some hesitation by interested parties in bidding for that lease against the brother of the chairman of the board.

The bid for this lease was accepted July first, but it was not until October nineteenth that the lease was executed. On that same day Myron Smith bought out the interest of Rexford St. Ledger in their joint bid, and negotiations started for the sale of the business and the assignment of the lease to Priscilla Theatres, Inc. It is

difficult to believe that there was no causal connection between these three incidents or that their concurrence on that day was mere chance. The deal was finally closed and Myron Smith received ten thousand dollars in notes for the assignment of the lease, for his equipment, and for an assignment of certain picture contracts. Whatever may have been the value of the picture contracts, Mr. Dam testified that Myron valued the equipment at a thousand dollars. Clyde Smith received three thousand dollars in notes of the purchaser in payment of his brother's debt.

It is unnecessary to discourse on the duties of public officials. Their obligations as trustees for the public are established as a part of the common law, fixed by the habits and customs of the people. Contracts made in violation of those duties are against public policy, are unenforcible, and will be cancelled by a court of equity. No definite rule can be given indicating the line of demarcation between that which is proper and that which is unlawful. In the words of this court in the case of *Lesieur* v. *Inhabitants of Rumford*, 113 Me., 317, 321, the question really is whether the town officer by reason of his interest is placed "in a situation of temptation to serve his own personal interests to the prejudice of the interests of those for whom the law authorized and required him to act in the premises as an official." See as authority for the same general principle the following. *Bay* v. *Davidson*, 133 Ia., 688; Dillon: Municipal Corporations, 5 ed., Secs. 772-773; *Lesieur* v. *Inhabitants of Rumford*, supra.

Gauged by the common and accepted standards defining the obligations of public officials, the lease given by the Town of Skowhegan to the defendant, Myron E. Smith, was unconscionable and unlawful. To hold otherwise would be to repudiate the doctrine that he who holds public office is in a position of public trust.

The decree of the sitting Justice sustaining the bill and declaring the lease void was properly entered. There is, however, no evidence controverting the fact that Priscilla Theatres, Inc., was an innocent party to this transaction. The decree should be modified to require the surrender and cancellation of the outstanding notes given by Priscilla Theatres, Inc., to Myron E. Smith, and to include a declaration that the two thousand dollars paid in cash shall be pay-

ment in full for all rights and property conveyed other than the lease.

*Appeal dismissed with additional costs. Decree to be modified in accordance with this opinion.*