STATE OF MAINE                          BUSINESS AND CONSUMER COURT

Cumberland, ss.


ANGELL FAMILY 2012 PROUTS NECK TRUST et als.,

            Plaintiffs-Appellants,

        v.                                  Docket No. BCD-CV-14-59 ✓
                                            AMH-CUM-02-18-15
TOWN OF SCARBOROUGH et al.,

            Defendants-Appellees


---

KENYON C. BOLTON, III, et als.,

            Plaintiffs-Appellants,

        v.                                  Docket No. BCD-CV-14-59

TOWN OF SCARBOROUGH et al.

            Defendants-Appellants


## DECISION AND JUDGMENT

Pursuant to M.R. Civ. P. 80B, the Appellants in these consolidated cases[1] appeal the decision of the Town of Scarborough Board of Assessment Review ("Board"), denying Appellants' requests for tax abatements, following the Town's 2012 partial property tax revaluation of some, but not all, waterfront and water-influenced properties in Scarborough.

Appellants in their Joint Rule 80B Brief argue the Board's decision must be reversed for four reasons:

1) The Assessor selectively targeted waterfront property in three neighborhoods for a substantial increase in valuation, while allowing waterfront property in a

---

[1] The cases had separate docket numbers in the Superior Court but had been consolidated by the time they were transferred to the Business and Consumer Court, and were assigned a single BCD docket number.

1

similarly situated neighborhood (Piper Shores) to avoid any increase in valuation.

2) The Assessor arbitrarily exempted certain waterfront properties from the increase in valuation.

3) The Assessor gave huge tax breaks to "excess land" properties, impermissible under Maine law.

4) The Assessor's increase in valuation at Prouts Neck was based on unqualified sales.

Appellants' Joint Rule 80B Brief at 5.

For the reasons set forth below, the court affirms the Board's decision, denies the appeal, and grants judgment to the Appellees.

## I. FACTUAL BACKGROUND

Appellant taxpayers own properties on or near the Atlantic Ocean, in the Prouts Neck neighborhood of Scarborough. (R. 2.) In 2012, after analyzing sales data, Scarborough Assessor Paul Lesperance increased the assessment of properties in the Prouts Neck neighborhood by 14.3 percent. (R. 647-50.) The assessed value of other properties in the Town of Scarborough decreased or remained the same. Before 2012, the last town-wide revaluation took place in 2005. (R. 588.) Appellants appealed the increased assessments on their properties to the Board, which consolidated the appeals, held hearings, and unanimously denied the appeals. (R. 6.)

## II. STANDARDS OF REVIEW

1. Rule 80B

In a Rule 80B appeal, the Superior Court reviews the findings made by the municipal decision maker to determine whether those findings were based upon an "erroneous interpretation of the law" or based upon conclusions of fact not "supported by substantial evidence on the record as a whole." *Bruk v. Town of Georgetown*, 436 A.2d 894, 897 (Me. 1981).

"Substantial evidence is evidence that a reasonable mind would accept as sufficient to support a conclusion." *York v. Town of Ogunquit*, 2001 ME 53, ¶ 6, 769 A.2d 172 (quoting *Sproul v. Town of Boothbay Harbor*, 2000 ME 30, ¶ 6, 746 A.2d 368). "The Court must affirm the decision of the [Board] unless that decision was unlawful, arbitrary, capricious, or unreasonable." *Driscoll v. Gheewalla*, 441 A.2d 1025, 1026 (Me. 1982). Procedural unfairness is reversible error and a "decision can be 'arbitrary and capricious' if it was not the product of the requisite processes." *Hopkins v. Dep't of Human Servs.*, 2002 ME 129, ¶ 12, 802 A.2d 999 (citations omitted). "That the record contains evidence inconsistent with the result, or that inconsistent conclusions could be drawn from the evidence, does not render the [Board's] findings invalid if a reasonable mind might accept the relevant evidence as adequate to support the [Board's] conclusion." *Town of Vienna v. Kokernak*, 612 A.2d 870, 872 (Me. 1992). The party seeking to overturn the decision bears the burden of persuasion on appeal. *Town of Sw. Harbor v. Harwood*, 2000 ME 213, ¶ 6, 763 A.2d 115 (citing *Sawyer Envtl. Recovery Facilities, Inc. v. Town of Hampden*, 2000 ME 179, ¶ 13, 760 A.2d 257).

2. Municipal Tax Assessments

With respect to judicial review of municipal tax assessments specifically, a court presumes tax assessments are valid. *Ram's Head Partners, LLC v. Town of Cape Elizabeth*, 2003 ME 131, ¶ 9, 834 A.2d 916. "A taxpayer who seeks a tax abatement must prove that the assessed valuation is 'manifestly wrong.'" *Terfloth v. Town of Scarborough*, 2014 ME 57, ¶ 12, 90 A.3d 1131. A taxpayer can prove an assessment is manifestly wrong by showing:

1) the judgment of the assessor was irrational or so unreasonable in light of the circumstances that the property was substantially overvalued and an injustice resulted;

2) there was unjust discrimination; or

3) the assessment was fraudulent, dishonest, or illegal.

3

*Yusem v. Town of Raymond,* 2001 ME 61, ¶ 9, 769 A.2d 865.

"The constitutional requirement [for tax assessments] is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners."[2] *Ram's Head Partners, LLC v. Town of Cape Elizabeth,* 2003 ME 131, ¶ 10, 834 A.2d 916. "Neither the constitution nor the statutes expect that a Board of Assessors could make an assessment with all values so exact that no 'expert' could disagree with them." *Sears, Roebuck & Co. v. Inhabitants of City of Presque Isle,* 150 Me. 181, 189, 107 A.2d 475, 480 (1954). Appellants in this case contend that the Town's assessment was manifestly wrong in that it unjustly discriminated against owners of waterfront and water-influenced properties. As mentioned above, the court will vacate the Board's decision denying tax abatement "only if the record compels a contrary conclusion to the exclusion of any other inference." *Terfloth v. Town of Scarborough,* 2014 ME 57, ¶ 13, 90 A.3d 1131.

"Taxpayers can prove discrimination only if they show that the assessor's system necessarily results in unequal apportionment." *Ram's Head,* 2003 ME 131, ¶ 10, 834 A.2d 916 (citing *City of Biddeford v. Adams,* 1999 ME 49, ¶ 14, 727 A.2d 346.) "The undervaluation of one set of similarly situated properties can support a finding of unjust discrimination, even when there is no undervaluation of the general mass of property." *Id.* ¶ 11. On the other hand, "some specific instances here and there" of undervaluation, "[s]poradic differences in valuations," or "mere errors of judgment on the part of the assessors" do not necessarily establish unjust discrimination. *Id. (*citing *Kittery Elec. Light Co.,* 219 A.2d 728, 740 (Me. 1966); *Sunday Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 353 (1918) ("[M]ere errors of

---

[2] Article IX Section 8 of the Constitution of the State of Maine reads as follows:

> All taxes upon real and personal estate, assessed by authority of this state, shall be apportioned and assessed equally, according to the just value thereof . . . [but] the Legislature shall have power to levy a tax upon intangible personal property at such rate as it deems wise and equitable without regard to the rate applied to other classes of property.

4

judgment by officials will not support a claim of discrimination. There must be something more-something which in effect amounts to an intentional violation of the essential principle of practical uniformity.").

Because the Board concluded that the Appellants failed to meet their burden of proof, this Court will vacate the Board's decision denying tax abatement "only if the record compels a contrary conclusion to the exclusion of any other inference." *Terfloth*, 2014 ME 57, ¶ 13, 90 A.3d 1131.

## III. DISCUSSION

The legal backdrop for the analysis was summarized by the Law Court in *Weekley v. Town of Scarborough*:

> The Maine Constitution requires that "[a]ll taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally according to the just value thereof." Me. Const. art. IX, § 8. "Just value" means market value. *Alfred J. Sweet, Inc. v. City of Auburn*, 134 Me. 28, 31, 180 A. 803 (1935). "The sale price of property is evidence of market value, which is used in determining property value for tax assessment purposes." *Wesson v. Town of Bremen*, 667 A.2d 596, 599 n. 5 (Me. 1995). *See also Shawmut Inn v. Town of Kennebunkport*, 428 A.2d 384, 394-95 (Me. 1981) ("market value" is "the price a willing buyer would pay a willing seller at a fair public sale ... in a free and open market."); *Arnold v. Maine State Highway Comm'n*, 283 A.2d 655, 658 (Me. 1971) ("evidence of what the property sold for in a bona fide sale is *most significant.*") (citation omitted).

676 A.2d 932, 934 (Me. 1996).

In these consolidated cases, the Appellants argue that, if the Town's partial revaluation of 2012 was to focus on water-influenced properties,[3] the Piper Shores neighborhood should have been revalued. They also argue that certain Prouts Neck properties should have been included in the revaluation rather than exempted, and that the increase for Prouts Neck was based on old sales that should not have been considered. In addition, they contend that the Town's "excess land" program is discriminatory.

---

[3] The term "water-influenced properties" refers to real property the value of which is enhanced by virtue of water frontage, water views or proximity to a water body.

5

A threshold question raised in these cases as well as in *Petrin v. Town of Scarborough*, another case before this court challenging the same revaluation, brought by property owners in the other water-influenced neighborhoods included in the revaluation, is whether the revaluation's focus on waterfront and water-influenced properties unjustly discriminated against the owners of waterfront and water-influenced residential properties generally.

That issue is discussed at length in the court's decision of this date in *Petrin*, but also merits some discussion here, given that it is raised in several of the Appellants' arguments in this case.

1. Whether the Assessor's Decision to Focus the Revaluation on Water-Influenced Properties and to Exclude Interior Properties Unjustly Discriminated Against Owners of the Revalued Properties

By statute, municipalities are required to maintain property assessments within a range of assessment ratios (ratio of assessed value to market value)—a minimum of 70% and a maximum of 110%. *See* 36 M.R.S. § .327(1). Thus, ongoing review and adjustment of assessments are necessary to assure that appropriate assessment ratios and, ultimately, equal apportionment of the overall tax burden, are maintained.

The Law Court has noted that, although "[t]ownwide revaluations are perhaps the best method of maintaining equal apportionment of the tax burden . . . assessors are not precluded from undertaking adjustments designed to maintain equal distribution of the tax burden in the time period between townwide revaluations." *Moser v. Town of Phippsburg*, 553 A.2d 1249, 1250 (Me. 1989).[4] In *Moser*, the Law Court held that such partial revaluations are an acceptable means of maintaining an equal distribution of the tax burden. *Id.*

---

[4] The facts of *Moser* are summarized in the opinion as follows:

> The assessors increased the valuation of all properties by 30 percent in 1982. Then in 1985 the assessors identified certain large-lot subdivisions in close proximity to the Kennebec River as having substantially increased in fair market value (largely due to the cleanup of the Kennebec River) and increased their valuation by fifty percent. Not every structure in the area was

6

Under current law, a municipality is required to meet certain minimum assessing standards. The municipality's ratio of assessment must be between 70% and 110% of just value. 36 M.R.S. § 327(1). Assessments must also meet a quality rating of 20 or less. *Id.* § 327(2).

In this case, the last town-wide revaluation took place in 2005. (R. 588.) The objective of the 2005 revaluation was to set the value of all properties in the Town at, or as close as possible to, 100% of their market value. *Id.* Since the town-wide valuation, the Town of Scarborough has monitored property values and periodically adjusted assessments, based on a review of qualifying sales each year, in what might be deemed an ongoing series of partial revaluations. The municipality in *Moser* utilized similar methods in performing the partial revaluation at issue in that case.

The goal of the continuing adjustments is to keep assessments in all tax neighborhoods in line with the Town's overall ratio, as verified by Maine Revenue Services during the agency's annual audit.

In determining whether and to what extent to engage in a partial revaluation of residential properties in Scarborough, Assessor Paul Lesperance[5] ("Mr. Lesperance" or the "Assessor") adopted a cutoff date of April 1, 2012, for sales data, meaning that he did not consider sales occurring after that date. (R. 164–165; 588.) He determined that while residential properties Town-wide were following a sales ratio close to 100%, water-influenced neighborhoods were tracking significantly lower, with assessed value at 70-80% of market

---

included. In addition, certain properties outside the area were included ("unusual architecturally-designed structures designed to fit a specific lot and structures that gain in value from their unique combination of land and buildings"). The plaintiff taxpayers, owners of real estate in the singled out area, challenged the increase.

553 A.2d at 1249-50.

[5] Paul Lesperance has since retired as the Town's Assessor. However, he previously held the position since 1984 and was responsible for the 2012 valuation. Mr. William Healey is the current Assessor as of the spring of 2013.

7

value as indicated by sales. As a result, the land valuations in four of the Town's water-influenced neighborhoods were adjusted upwards.

The 2012 assessment resulted in a 14.3% increase in the valuation of the Appellants' properties in Prouts Neck. (R. 596.) The Appellants argue that there was no evidence in the record that would allow the Board to conclude that the partial revaluation increased parity within the town. However, "assessors are not precluded from undertaking adjustments designed to maintain equal distribution of the tax burden in the time period between townwide revaluations." *Moser*, 553 A.2d at 1250. Rather, only a "rough equality" in tax treatment of similarly situated property owners is constitutionally required. *Id.* (citing *Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336, 343 (1989)).

Before the Board, the Town offered several exhibits to rebut Appellants' claims of unfair treatment. These exhibits compare the assessments for interior properties with assessments for the waterfront and water-influenced properties that were subject to the partial revaluation. In each of the exhibits, the Assessor shows that the assessments for interior properties were tracking much closer to 100% of the property's value based on sales. (R. 164-165.) Assessments on the waterfront properties, however, were much lower than sale prices, which means the assessments on these properties were low. Further, Exhibit T-4B shows that the revaluation materially improved the average ratio of assessed value to market value from 83% in 2011 to 93% in 2012, with a continued high quality rating of 10%, demonstrating parity.

Thus, the court finds that the Assessor's decision to increase assessments only for water-influenced properties was justified and supported by the evidence, and did not unjustly discriminate against the Appellants. However, this conclusion does not end the inquiry because the Appellants have raised a variety of more specific objections to the manner by which the revaluation was carried out with respect to their properties.

8

2. Whether the Assessor's Decision to Revalue Properties in the Appellants' Neighborhood and Three Other Waterfront and Water-Influenced Neighborhoods, While Not Revaluing the Piper Shores Neighborhood, Wrongfully Discriminated Against Appellants

The first argument presented in the Appellants' brief is that the Assessor's decision to revalue the Appellants' Prouts Neck neighborhood as well as the Higgins Beach, Pine Point and Pillsbury Shores neighborhood, while omitting the waterfront Piper Shores neighborhood, constituted unjust discrimination.

Given that the Assessor had decided to focus the revaluation on water-influenced neighborhoods, say the Appellants, the similarities between the revalued areas and Piper Shores compelled the Assessor to revalue Piper Shores as well. They also contend that the Assessor had sufficient data to increase the values of Piper Shores properties, and that he wrongfully refused to consider a qualified sale indicating that properties in the Piper Shores area should be revalued. During the Board hearing, the Appellants presented the testimony of Leslie Craig, an experienced real estate agent, to the effect that property values in Piper Shores move in the same way as values in the Prouts Neck area, and therefore, that there was no justification to revalue Prouts Neck but not Piper Shores.

The Town contends that the Piper Shores neighborhood is significantly different in character from the Prouts Neck and other water-influenced neighborhoods. Among the distinguishing features reflected in the record:

- The Piper Shores neighborhood encompasses twenty very large waterfront parcels along two miles of coastline while Prouts Neck has over 200 parcels on less than a half mile of coastline. (R. 8; 421; 426, 430.)

- Piper Shore retirement facility is the largest taxpayer in Piper Shores. Prouts Neck has no comparable facility. (R. 421.)

- Prouts Neck has a beach club and other amenities available to residents that are not present in Piper Shores. (R. 170.)

In addition, the Town contends that the paucity of sales data in the Piper Shores area

9

justifies the Assessor's decision to exclude Piper Shores from the valuation. Since the Town-wide valuation in 2005, there have been only two sales in Piper Shores.

The first closed in 2007 and it sold for an amount close enough to its assessed value to indicate no cause for revaluating that property or others in the Piper Shores neighborhood. (R. 162.) The second property sold went under contract in March 2012 and the sale closed on April 29, 2012. Exhibit T 26 is the sale report for this parcel, the "Carver" property, Map R101, Lot 20. The selling price was $2,800,000, 15% above the property's assessed value of $2,375,300. (R. 278; *see* R. 588-91; 762-63.) The Assessor excluded this sale for several reasons.

First, it occurred after—but admittedly only a few weeks after—the April 1, 2012 cutoff date the Assessor had adopted. Were this the sole basis for the Assessor's decision not to include the Piper Shores neighborhood in the partial revaluation, the decision might be more vulnerable to challenge, especially since the Assessor used at least one post-April 1 sale in his paired sale analysis of the Prouts Neck neighborhood.

However, the Assessor's decision not to use the Carver property as a justification for revaluing the Piper Shores neighborhood rests on more substantial ground. The Carver property is a residential property of about 40 acres, with a separately saleable house lot. The bulk of the land has been encumbered by a conservation easement and enrolled in farm and open space tax program, and part of the land area was previously enrolled in the tree growth. (R. 861-62.) The Town's current assessor, William Healey, testified that the parcel's easement and enrollment in the current use tax programs would preclude the use of sale from being considered in the Town's annual sales and ratio studies, and that he would not rely on this single sale as a basis for revaluing the Piper Shores neighborhood. (R. 861-62.)

10

Appellants' argument regarding the exclusion of Piper Shores from the revaluation relies on *City of Biddeford v. Adams* for the principle that selective revaluation necessarily results in unequal apportionment where the assessor revalues one neighborhood, while not revaluing a similarly situated neighborhood. 1999 ME 49, 727 A.2d 346. While the Law Court has recognized that "the selection of one or a few areas for revision of property values" has the potential for creating discrimination, not every selective revaluation constitutes unjust discrimination. *See Moser v. Town of Phippsburg*, 553 A.2d 1249, 1250 (Me. 1989).

In *Adams*, the town's assessor reduced property values in the Fortunes Rocks neighborhood, but did not reduce values in the adjacent neighborhood of Granite Point. 1999 ME 49, ¶ 3, 727 A.2d at 348. The taxpayers appealed to the State Board of Property Tax Review ["Board"], which concluded the assessor unjustly discriminated against the Granite Point neighborhood. *Id.* at ¶ 4, 727 A.2d at 348.

However, the *Adams* case is distinguishable on its facts. The Law Court in *Adams* upheld the Board's finding of discrimination on four grounds:

1) Certain marshland was considered part of the median lot size in Granite Point, but similar marshland was not considered in Fortunes Rocks. *Id.* at ¶ 16.

2) The Board found that the coastal neighborhoods were homogenous.

3) The Assessor's decision to reduce the neighborhood factor based on his "gut feeling" was arbitrary in the view of the Board. *Id.* at ¶ 17.

4) The Board found that Biddeford changed the neighborhood code for Granite Point to that of Biddeford Pool and then used two sales in Biddeford Pool, one for more than assessed value and one for less, to justify denying a reduction in the assessments for Granite Point. Within a two-year period thereafter it changed Granite Point back to a separate neighborhood code. This, the Board concluded, was arbitrary and "indicative of changing numbers to suit a situation at the time it happens."

*Id.* at ¶ 17.

In this case, none of the above elements is present. Here, there is no pattern of arbitrary or sporadic assessments. Further, there was evidence supporting the Board's determination that there are material differences between the Piper Shores neighborhood and the water-influenced neighborhoods that were revalued.

While the Board could have drawn a contrary conclusion based on other evidence,[6] the court reviews the findings made by the Board to determine whether there was an error of law or whether the conclusions of fact were supported by substantial evidence on the record as a whole. *Bruk v. Town of Georgetown*, 436 A.2d 894, 897 (Me. 1981). Further, "subsidiary facts may be obvious or easily inferred from the record and the general factual findings." *Wells v. Portland Yacht Club*, 2001 ME 20, ¶ 10, 771 A.2d 371, 375 (citing *Christian Fellowship and Renewal Ctr. v. Town of Limington*, 2001 ME 16, ¶ 10, 769 A.2d 834). In summary, there was sufficient evidence on the record to justify the Assessor's decision to revalue the Prouts Neck neighborhood and other water-influenced neighborhoods in Scarborough, but not the Piper Shores neighborhood.

3. <u>Whether the Assessor Properly Excluded Certain Prouts Neck Properties From the Revaluation</u>

The Appellants argue that the Assessor should not have excluded four Prouts Neck properties from the revaluation.

The Appellants presented evidence before the Board that Mr. Lesperance did not increase the valuation of *all* waterfront and water-influenced properties in Prouts Neck. Rather, he excluded Lots 16, 22, 40, and 45 from the revaluation. (R. 591) Mr. Lesperance testified that Lot 16 should have been included in the revaluation, but was omitted due to a

---

[6] For example, the Board found the testimony of Leslie Craig, a broker of high-end real estate in Prouts Neck and Piper Shores, unpersuasive. Craig testified that the two neighborhoods are similarly attractive to the same high-end market of buyers. (R. 800-03.) However, the Board concluded that despite Craig's testimony, the neighborhoods were different.

12

coding error. *Id.* Further, Lot 22 was excluded because it was owned by the Prouts Neck Association and the improvements on the land consisted only of a bathhouse and changing cabins. (R. 592-93.) Lot 40 was excluded because Mr. Lesperance believed that the property was already adequately valued based on its limited utility and demand. Finally, Lot 45 was excluded because it surrounds the Winslow Homer studio and has a history of litigation brought by abutters. (R. 593-94.) The court finds that these exclusions have been adequately justified and do not demonstrate unjust discrimination. Mr. Lesperance provided reasonable explanations for excluding each property. The Appellants, on the other hand, provided no evidence that Mr. Lesperance's exclusion of four properties with distinct, if not unique, characteristics among the more than 200 properties in Prouts Neck resulted in unequal apportionment or discriminated against the Appellants.

4. Whether the Assessor Properly Relied On Sales Prior to the "Great Recession" and On Three Sales Alleged Not to Have Been Arms-Length Transactions

Appellants raise two arguments regarding the sales of Prouts Neck properties that the Assessor relied upon in determining to increase the assessed values of their properties.

Appellants maintain that the economic downturn in 2008 (what they term the "Great Recession") caused a significant downturn in property values, including those in Prouts Neck, rendering the Assessor's reliance on sales prior to 2008 arbitrary and unreasonable. Four of the eight qualified sales of property in the Prouts Neck neighborhood relied upon by Mr. Lesperance pre-dated the Great Recession.[7]

However, the Town's evidence indicated that property values in the Prouts Neck neighborhood did not decline in as a result of the Great Recessions. The Town provided evidence of two "paired sales" in the Prouts Neck neighborhood—sales of the same property at

---

[7] These sales include Map 17, Lot 15 which was sold in December of 2007; Map 18, Lot 2405 which was sold in January of 2007; Map 19, Lot 1 which was sold in June of 2006, and Map 19, Lot 18, which was sold in October of 2005. (R. 641-46.)

13

different times. (R. 647-652.) In each instance, one of the sales took place before the Great Recession and the other took place during or after the Great Recession. Thus, the Board could consider these paired sales particularly illuminating in terms of the effect of the Great Recession upon Prouts Neck property values.

The first paired sale was of the property at 5 Richmond Row, which sold in 2007 for $3.3 million (27% above assessed value) and again in 2011 for $3.3 million (23% above assessed value). The second paired sale was of the property at 2 Jocelyn Road, which sold in 2006 for $4 million (24% above assessed value) and again in 2013 for $3.9 million (10% above assessed value). These paired sales data thus are entirely consistent with each other, and they indicate that the properties at all relevant times were under-assessed, not over-assessed, and that their value did not decline appreciably as a result of the Great Recession. Those points in turn support a third inference—that, because the Great Recession was not shown to have had a significant effect on Prouts Neck property values, pre-Great Recession sales remain valid indicators of market value.

The Board reasonably decided that the paired sales data indicated that property values in Prouts Neck remained relatively stable through the Great Recession. For this reason, the court affirms the Board's finding that the paired sales were appropriate market indicators for property value in this case.

Appellants also challenge the Assessor's reliance on three sales of Prouts Neck properties on the ground that the transactions were not conducted at arms-length and are therefore not "qualified sales":

> **Map 19, Lot 6:** Appellants contend that this property is a "compound style" property that was sold to NFL commissioner Roger Goodell. The sale was not listed or exposed to the general market. Further, the Assessor admitted that this sale should be taken with a "grain of salt." (R. 643-44, 814-15.)

14

**Map 18, Lot 2403**: this was the sale of unimproved curtilage owned by the Black Point Inn. (R. 433, 812-14.) Appellants contend that this was a private sale between abutters, and was not for sale to the members of the general public. Rather, it was only open to investors of the Inn or those willing to pay a $50,000 participation fee. (R. 641)

**Map 19. Lot 17**: Appellants contend that this was a private sale to an abutter, however, the property sold for its assessed value. (R. 644-46.)

In Maine, "tax assessors are under both a constitutional and statutory obligation to determine the 'just value' of taxable property." "'Just value' is the equivalent of 'market value.'" *Shawmut Inn v. Inhabitants of Town of Kennebunkport*, 428 A.2d 384, 389 (Me. 1981) (citing *Sweet, Inc. v. City of Auburn*, 134 Me. 28, 180 A. 803 (1935); *Frank v. Assessors of Skowhegan*, 329 A.2d 167, 173 (Me. 1974)).

The Law Court has "defined market value as the price a willing buyer would pay a willing seller at a fair public sale." *Frank*, 329 A.2d at 173. An actual recent sale "shows what is paid, not . . . the exact value. A sale may represent sentimental value or value as an investment, possible future value, or it may represent use, location, or any one or more of many things." *Shawmut Inn*, 428 A.2d at 389 (citing *Sears, Roebuck & Co. v. Inhabitants of City of Presque Isle*, 150 Me. 181, 188, 107 A.2d 475, 479 (1954)). "The weight to be given to the sale price, however, depends upon the petitioner's ability to show that the sale price was indicative of the price a willing buyer would pay in a free and open market." *Shawmut Inn*, 428 A.2d at 394-95. The marketplace must be one where normal, as opposed to extraordinary, conditions exist. *Sweet*, 134 Me. 28, 180 A. 803, 804 (1935).

In this case, the Appellants presented no evidence on the record that the transactions considered by the Assessor were less than arms-length. While one sale was to an abutter, the property sold for its assessed value, and did not on its face appear to be other than an arms-length transaction. As to the other sales, there is no indication in the record that those sales should not be taken as indicative of market value.

5. <u>Whether the "Excess Land" Program is Discriminatory</u>

Appellants contend that the Town's "excess land" program is discriminatory and results in assessments that are manifestly wrong. As noted in this court's decision in *Petrin v. Scarborough*, there is a significant question as to whether the Town's "excess land" program comports with Maine law, given that the program values "excess" land at well below market value.[8]

Because the excess land policy was not applied to any of the Appellants' properties, the court must determine whether the Appellants have standing to challenge the validity of the Town's policy, as taxpayers. In Maine, courts have adopted the preventive-remedial doctrine to determine whether a taxpayer has standing in a suit against a municipality. The doctrine recognizes the right of taxpayers to apply to the court for preventive relief in the case of threatened unlawful action by municipal officers, while denying standing to taxpayers seeking remedial relief for a wrong that has already occurred. *McCorkle v. Town of Falmouth*, 529 A.2d 337, 338 (Me. 1987); *Buck v. Town of Yarmouth*, 402 A.2d 860, 861-862 (Me. 1979); *Cohen v. Ketchum*, 344 A.2d 387, 390-392 (Me. 1975).

Maine taxpayers have no right to apply for remedial relief after the commission of an illegal municipal act where the act is one that affects the entire community and there is no particularized harm to the plaintiffs bringing the suit.[9] *See Tuscan v. Smith*, 130 Me. 36, 153 A. 289, 293 (1931); *Tiling v. City of Portland*, 268 A.2d 888, 890 (Me. 1970). Further, where the remedial injury claimed is one shared equally by all the members of the community the action

---

[8] The Town defends its "excess land" program by contending that the total value placed on the main property and the excess land reflects their combined market value, but the Appellants note that the "excess land" parcels are in fact assessed separately, at well below market value.

[9] "[A]n individual citizen who suffers no particularized injury from a public wrong can not seek relief from the courts; relief vindicating public rights must be sought by . . . the Attorney General of the State of Maine." *Buck v. Town of Yarmouth*, 402 A.3d at 861; *Blodgett v. School Admin. Dist. No, 73*, 289 A.2d 407, 411 (Me. 1972).

must be brought by the Attorney General of the State as representative of not only the particular plaintiffs who seek remedial relief but the entire community. *LaFleur ex rel. Anderson v. Frost*, 146 Me. 270, 80 A.2d 407 (1951); *Eaton v. Thayer*, 124 Me. 311, 128 A. 475 (1925); *Bayley v. Wells*, 133 Me. 141, 174 A. 459 (1934). Thus, in the municipal setting, "taxpayers who do not allege and prove special injury have standing to seek only 'preventive' relief from illegal actions by municipal officers."[10] *Common Cause v. State*, 455 A.2d 1, 10 (Me. 1983).

In this case, the Appellants lack standing to achieve any form of remedial relief concerning the excess land program. The only relationship the Appellants have to the program is that they are taxpayers. Appellants challenge the policy arguing that waterfront and water-influenced properties bear much less of a relationship to market value than assessments of general residential properties within the town. However, Appellants have failed to demonstrate on the administrative record that the excess land program affects them differently than it does Scarborough taxpayers generally. Rather, the claim is more of a general grievance, the effects of which are suffered by the entire community.

Thus, if Appellants are to have relief at all, they must demonstrate that they are entitled to preventive relief. *Blodgett v. School Administrative District 73*, Me., 289 A.2d 407 (1972). Here, the Appellants have made no claim challenging the prospective application of the program. Instead, Appellants have utilized the Town's application of the program as tangential evidence that the Town's assessments are manifestly wrong. Because the Appellants are not seeking preventive relief, the court finds they lack standing to challenge the Town's application of the excess land program.

---

[10] "Application of this doctrine is largely a definitional undertaking. If the relief sought by municipal taxpayers lacking special injury is deemed 'preventative,' the courthouse door stands open; if the relief is deemed 'remedial,' that door swings shut." *Lehigh v. Pittston Co.*, 456 A.2d 355, 358 (Me. 1983).

17

## IV. CONCLUSION

Based on the foregoing, the court denies Appellants' appeal and affirms the decision of the Town of Scarborough's Board of Assessment Review. Judgment is granted to the Appellees, along with their costs as prevailing parties.

Pursuant to M.R. Civ. P. 79, the clerk is hereby directed to incorporate this order into the docket by reference.

Dated February 16, 2015

A. M. Horton, Justice
Business & Consumer Court

Entered on the Docket: 2-18-15
Copies sent via Mail ___ Electronically ✓

18

**Kenyon C. Bolton III. and Angell Family, et al. v. Town of Scarborough**
**BCD-CV-14-59**


### Plaintiffs
Kenyon C Bolton III
Bolton Juniper Ledge Trust
Matford Holding Inc.
Eileen Gillespie Trust
Edward Maynard Trust
Martha Hallward
Nan McEvoy
Boyle Trust & Investment
Frank Olson
Sarah Olson
CPC Maine LLC

Counsel:                          William Dale, Esq.
                                  PO Box 9785
                                  Portland, ME 04104


Angell Family
Timothy Bartol Trust
26 Jocelyn Rd Nominee Trust
James Kohlberg
Mandalay Realty LLC
30 Saccarappa LLC
Lee Sprague
J. H Walton Jr.

Counsel:                          Jonathan Block, Esq.
                                  Kris Eimicke, Esq.
                                  Merrills Warf
                                  254 Commercial St.
                                  Portland, ME 04101


### Town of Scarborough
### Defendant

Counsel:                          Robert Crawford, Esq.
                                  JOel Moser, Esq.
                                  PO Box 9729
                                  Portland, ME 04104