George LEHIGH et al.

v.

The PITTSTON COMPANY et al.

Supreme Judicial Court of Maine.

Argued Nov. 15, 1982.

Decided Feb. 15, 1983.

Lund, Wilk, Scott & Goodall, Gordon H.S. Scott (orally), Augusta, Fletcher & Foster, John P. Foster, Eastport, for plaintiffs.

Marden, Dubord, Bernier & Chandler, Bruce W. Chandler (orally), Alton C. Stevens, Waterville, for defendants.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, CARTER and WATHEN, JJ.

NICHOLS, Justice.

This appeal requires our assessment of the validity of an option agreement between the City of Eastport and The Pittston Company, the successor in interest to Metropolitan Petroleum Company, regarding the sale by the City of the present Eastport Municipal Airport and an adjoining public park.

Contending that this option agreement and amendments thereto were void, several users of the airport and certain resident taxpayers of the City of Eastport commenced suit in Superior Court, Washington County, on June 2, 1980, seeking a declaration that the option agreement and amendments were invalid. The Plaintiffs also sought injunctive relief to prevent the imminent conveyance of this property by the City to The Pittston Company. Named as Defendants were the City of Eastport, five members of the Eastport City Council, and The Pittston Company (Pittston). On August 22, 1980, Pittston filed a cross-claim against the Eastport City Council seeking specific performance of the amended option agreement and other relief.

By an order granting partial summary judgment entered on July 31, 1981, and by a final judgment after a bench trial entered on May 24, 1982, the Superior Court declared the option agreement and amendments null and void as *ultra vires.* Accordingly, the court permanently enjoined Pittston and the City of Eastport from attempting to enforce the amended agreement. On the cross-claim for specific performance the court entered judgment against Pittston; it did, however, award Pittston $10,000 with interest on Pittston's claim for other relief. This timely appeal by Pittston and cross-appeal by the Plaintiffs followed.

The Eastport Municipal Airport, the primary focus of this controversy, was constructed during the early 1940's. From its inception the airport was heavily dependent on federal funding.

Under two nonrepayable grants in 1941 from the Works Progress Administration, the City of Eastport received over one-half million dollars for construction of the airport. As a consequence, the City in 1942 entered an agreement with the Civil Aeronautics Administration (CAA) whereby, in partial consideration for this funding, the City promised that during its "useful life" the airport would "at all times be operated for the use and benefit of the public . . ."[1]

In 1959, the City of Eastport again received federal monies for the airport, this time in the form of a Federal Aviation Agency (FAA) grant for runway resurfacing, approachway clearing, and land acquisition. The FAA grant agreement, which

---

1. Eastport, Maine, Resolution Constituting Agreement with the United States Relative to Operation and Maintenance of the Eastport Airport §§ 1(d), 4 (April 8, 1942). The agreement also provided that during its useful life "the Airport will be operated as such, and for no other purpose . . . ." *Id.* at § 1(d). Furthermore, the agreement stated:

In order to protect the rights and interests of the Government under this resolution, the City of Eastport agrees that it will not enter into any transaction which would operate to deprive it of any of the rights and powers necessary to perform any or all of the convenants made herein, unless by such transaction the obligation to perform all such covenants is assumed by another public agency. *Id.* at § 1(g).

authorized the expenditure of up to $42,350 in matching federal funds, imposed several conditions upon the City of Eastport. These conditions were to remain

"in full force and effect throughout the useful life of the facilities developed under the Project but in any event not to exceed twenty (20) years from the date of said acceptance of an offer of Federal aid for the Project." [2]

Among the conditions were several similar to those imposed by the 1942 agreement. The City of Eastport agreed to "operate the Airport as such for the use and benefit of the public" and to "keep the Airport open to all types, kinds, and classes of aeronautical use without discrimination . . . ." [3] Additionally, the City promised that it would "not enter into any transaction which would operate to deprive it of any of the rights and powers necessary to perform any or all of the covenants made [in the grant agreement]." [4]

Despite the substantial capital infusions accompanying the 1942 and 1959 agreements, the original high expectations for economic development of the airport never were realized. Efforts to bring in scheduled commercial flights were unsuccessful. After 1959 the airport facilities deteriorated. General aviation use of the airport continued, but such use was sporadic. Only a couple of private aircraft actually were based at the airport.[5]

On March 22, 1968, nine years after the 1959 FAA grant agreement was signed, the Eastport City Council executed a confidential agreement with Metropolitan Petroleum Company, a division of Pittston. This agreement purported to give Metropolitan a one-year option to purchase a 254-acre parcel comprised of the Eastport Airport and a small adjacent park. Metropolitan, which intended to construct a refinery on this land, paid $10,000 for this option. The purchase price for the entire parcel was set at $302 per acre; thus, the total price was approximately $76,700.[6]

Metropolitan elected to exercise its option on February 3, 1969. Nonetheless, no purchase was consummated. Metropolitan then assigned all of its rights under the agreement to Pittston.[7] The option agreement was amended twice, first on June 4, 1974, and then on May 2, 1977. Each amendment extended by one year the time for performance under the original agreement.[8]

From the time it entered the option agreement with Metropolitan, the City of

---

**2.** Eastport, Maine, Federal Aviation Agency Grant Agreement-Project Application, pt. III(1) (March 20, 1959).

**3.** *Id.* at pt. III(2). Similarly, the City covenanted to "suitably operate and maintain the Airport" and "not permit any activity thereon which would interfere with its use for aeronautical purposes." *Id.* at pt. III(6). In addition, the City agreed to "prevent the use of any land either within or outside the boundaries of the Airport in any manner . . . which would create a hazard to the landing, taking-off, or maneuvering of aircraft at the Airport, or otherwise limit the usefulness of the Airport." *Id.* at pt. III(7). Furthermore, the City agreed that: "All facilities of the Airport developed with Federal aid, and all those usable for the landing and taking-off of aircraft, will be available to the United States at all times, without charge, for use by military and naval aircraft . . . ." *Id.* at pt. III(8).

**4.** *Id.* at pt. III(11).

**5.** The overall disrepair of the airport is indicated by a Federal Aviation Administration Compliance Inspection report issued on July 28, 1970. That report termed one of the airport's two runways "fair," and the other, "poor." Various safety hazards were noted. The report ultimately concluded that the airport was in noncompliance with FAA standards.

**6.** Incorporated in the option agreement was a "Purchase Contract" which specified the terms of the sale. This contract provided that the $10,000 paid for the option agreement would be credited toward the purchase price. The purchase contract was to become operative upon Metropolitan's election to exercise the option.

**7.** Metropolitan was a wholly-owned subsidiary of Pittston. For purposes of this litigation the parties stipulated that Metropolitan and Pittston are identical.

**8.** Each amendment was twice renewed.

Eastport was corresponding with the FAA in an attempt to secure a release from the 1959 grant agreement, thereby enabling the City to dispose of the airport. These efforts were unsuccessful. Finally, on February 7, 1980, the City was notified by the FAA that it could do as it wished with the airport inasmuch as the twenty-year term of the 1959 grant agreement had expired.[9]

On March 7, 1980, the City of Eastport notified Pittston that it could now convey clear title to the property in question. On March 22, 1980, and prior to any conveyance, the case before us was commenced in Superior Court.

At the threshold, Pittston raises issues regarding standing and mootness. It also raises a procedural issue concerning the Superior Court's order of summary judgment.

We must first address the issue of standing. There are eighteen named Plaintiffs in this action: twelve are resident taxpayers of the City of Eastport; one is a nonresident user of the airport; and five are both resident taxpayers and airport users.[10] The Superior Court concluded that the Plaintiffs had standing to bring this action. We agree.

Pittston advances a two-fold argument. Pittston first contends that the relief sought here is remedial rather than preventative. It then argues that none of the Plaintiffs has the requisite degree of particularized injury for maintaining an action seeking remedial relief against a municipality.

■ The preventative-remedial dichotomy is the heart of a long-established doctrine which governs the standing of taxpayers to sue the municipalities in which they reside. In substance, this doctrine operates to exempt taxpayers who seek "preventative" relief from the general rule that standing must be predicated on particularized injury. In contrast, taxpayers who seek "remedial relief" are required to show special or particularized injury: injury different from that incurred by every other taxpayer. *Buck v. Town of Yarmouth,* 402 A.2d 860, 861–62 (Me.1979); *Heald v. School Administrative District No. 74,* 387 A.2d 1, 3 (Me.1978); *Cohen v. Ketchum,* 344 A.2d 387, 390–91 (Me.1975).

Application of this doctrine is largely a definitional undertaking. If the relief sought by municipal taxpayers lacking special injury is deemed "preventative," the courthouse door stands open; if the relief is deemed "remedial," that door swings shut.[11]

---

9. The FAA letter made no mention of the effect, if any, of the 1942 agreement on the City's present ability to dispose of the airport.

10. The twelve resident taxpayers are: George Lehigh, Barbara Lehigh, John Pike Grady, Charles Lewis, Kathryn Lewis, Marie Jones, Robert Bowman, Rhoda Bowman, Margaret McGarvey, Francis O. Ayres, Allan Sutherland, and Boyd Frankland. The nonresident airport user is Willard Ketchen. The five resident taxpayers who are also airport users are: Joseph McPhail, Ernest Barnes, Bernard Cecire, Dennis Turner, and Louis Arnold. A motion dismissing this action as to a nineteenth Plaintiff, Carleton Small, was granted on January 1, 1981.

11. Although we are not squarely presented with, and thus do not today decide, the continued viability of the preventative-remedial doctrine with regard to taxpayer standing to bring actions against municipalities, we recognize that this doctrine may have little more to commend itself than its age.

The preventative-remedial distinction is no bright line test. This Court's past decisions distinguishing between preventative and remedial relief provide little guidance. In cases in which the relief sought has both remedial and preventative coloration, a principled differentiation often is difficult.

A further problem lies in the conflict between this doctrine, which encourages taxpayers to sue anticipatorily, and the doctrine of ripeness, which mandates restraint. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *Lever Brothers Company v. Federal Trade Commission,* 325 F.Supp. 371, 373 (S.D.Me.1971).

As we recently observed in *Common Cause v. State of Maine,* 455 A.2d 1, 11–12 (Me.1983) any statutory limitations on the equity powers of the Superior Court which once may have supported the preventative-remedial distinction no longer exist. The only remaining justification appears to be the policy concern identified in *Eaton v. Thayer,* 124 Me. 311, 316–18, 128 A. 475, 477–78 (1925), protecting public officials against "vexatious liti-

■ Turning to the case at bar, there is a perceptible remedial flavor to the relief requested by the Plaintiffs in the sense that the option agreement and amendments were signed long before this action commenced. This, however, does not diminish the fundamentally prospective and preventative nature of the relief sought. The Superior Court was not asked to undo an already completed transaction.[12] Rather, the option agreement and the two amendments were but preliminary steps leading to the intended sale of the Eastport Airport. That sale was not consummated; in fact, this action effectively blocked the sale. The overriding purpose of this action was to prevent a future sale.[13] We conclude, therefore, that the Plaintiffs' status as resident taxpayers of the City of Eastport gave them standing to bring this action.[14]

Pittston next argues that the Superior Court erred in entering judgment for the Plaintiff due to the mootness of this action. Essentially, Pittston contends that because the City of Eastport has present authority to dispose of the airport under either the Revenue Producing Municipal Facilities Act, 30 M.R.S.A. § 4251 *et seq.* (1978 & Supp.1982–1983) or Municipal Home Rule, 30 M.R.S.A. § 1911 *et seq.* (1978 & Supp. 1982–1983), the question of the validity of the option agreements and amendments is moot. This argument is without merit.

■ The City of Eastport has not yet conveyed the airport to Pittston under either of these statutory provisions; Pittston merely contends that it could.[15] We cannot say that such a conjecture operates to deprive this action of its "controversial vitality." *State v. Gleason,* 404 A.2d 573, 578 (Me.1979). Pittston's cross-claim for specific performance alone assures the continued vitality of this controversy as between all parties.[16]

A third issue raised by Pittston concerns the appropriateness of the Superior Court's order granting summary judgment in favor of the City of Eastport on Pittston's cross-claim for specific performance. Pittston argues that because the motion for summary judgment before the court and the argument at hearing only concerned the Plaintiffs' claim, the court's *sua sponte* order on the cross-claim was error.

gation" and "multiplicity of suit." As we noted in *Common Cause* in rejecting an invitation to extend the preventative-remedial doctrine to taxpayers' actions against the State: "If the official conduct involved is indeed unconstitutional, protecting the officials in question from harassment cannot be deemed a desirable end in itself." 455 A.2d at 9.

12. *Cf. Buck v. Town of Yarmouth,* 402 A.2d at 862 (correction of town council's failure to insert article in warrant termed "remedial"); *Cohen v. Ketchum,* 344 A.2d at 393 (nullification of election termed "remedial"); *Bayley v. Inhabitants of the Town of Wells,* 133 Me. 141, 145, 174 A.2d 459, 461 (1934) (accounting of money termed "remedial"); *Eaton v. Thayer,* 124 Me. at 314, 128 A. at 476 (restitution of funds illegally paid from treasury termed "remedial").

13. Although the Superior Court did declare the option agreement and amendments void, this does not transform the action into a remedial one. In *Tuscan v. Smith,* 130 Me. 36, 153 A. 289 (1931), the Plaintiffs sought cancellation of an illegal lease and an injunction preventing the lessees from taking possession. The lease was held void, yet this Court termed this action

"preventative" and upheld the standing of the taxpayer Plaintiffs. 130 Me. at 44, 153 A. at 293.

14. This leaves one Plaintiff, Willard Ketchen, who is a nonresident user of the airport. This Court, in *Heald v. School Administrative District No. 74,* 387 A.2d at 4–5, concluded that failure to allege taxpayer status deprived Plaintiffs of a right to request preventative relief. In *Heald,* however, no special injury was alleged. Ketchen alleged that he operated a commercial flying school and air taxi service and that he used the Eastport Airport for training students and for picking up air taxi passengers. We conclude that although Ketchen was not a resident taxpayer of the City of Eastport, he had standing to bring this action.

15. We therefore need not decide the effect, *vel non,* of the Revenue Producing Municipal Facilities Act or Municipal Home Rule on this action.

16. We find no merit whatsoever in Pittston's suggestion that this case is moot as to the Plaintiffs but not as between Pittston and the City of Eastport.

It is true that a *sua sponte* summary judgment order on an unargued cross-claim does not appear to be contemplated by the Rules.[17] Nevertheless, on the specific facts of this case, if this order was error, that error was harmless. The cross-claim for specific performance in this action was virtually indivisible from the case in chief. On the merits the Court concluded that the option agreement and amendments were null and void. Such a conclusion necessarily renders specific performance impossible. Any error was ultimately harmless. M.R. Civ.P. 61.

Arriving at the substantive issue, the Superior Court decided that the option agreement and amendments thereto were null and void and permanently enjoined enforcement, the court thus following an *ultra vires* analysis. Essentially, the court concluded that because the airport was held in a governmental capacity and because the airport had not been abandoned, the City of Eastport acted beyond its statutory powers in purporting to sell the property to Pittston.

Although we agree with the result the Superior Court ultimately reached on this issue, we prefer to base the conclusion of voidness directly on the illegality of that agreement and the amendments thereto.[18]

The first legal difficulty encountered by the option agreement and amendments involves federal law. Section 1349(a) of the Federal Aviation Act of 1958 provides, in part: "There shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended." 49 U.S.C. § 1349(a) (1976). The Eastport Airport, which received in excess of one-half million dollars in federal funding, is clearly embraced by this section of the Act.[19]

In a similar action arising in Tennessee, that court relied on section 1349(a) in holding void an exclusive lease of a fixed-base operation at a municipal airport which had been constructed with federal funds. *Niswonger v. American Aviation, Inc.,* 411 F.Supp. 769, 771 (E.D.Tenn.1975), *aff'd,* 529 F.2d 526 (6th Cir.1976). The Tennessee court defined "exclusive right" as "a power, privilege, or other right excluding or denying another from enjoying or exercising a like power, privilege or right." *Id.* at 770 (quoting Department of Transportation Federal Aviation Administration, Advisory Circular No. 150/5190–2A of April 4, 1972). If the lease of an airport facility constitutes the grant of an exclusive right, *a fortiori,* the sale of an airport to a private party

---

17. M.R.Civ.P. 56(c) provides only that "Summary judgment, when appropriate, may be rendered against the moving party."

18. Although the Superior Court primarily followed an *ultra vires* analysis, its findings reflect that the court also relied upon the overall illegality of the agreement and amendments in denying specific performance. While the concepts of *ultra vires* and illegality overlap to some degree, "*ultra vires*" focuses more on a party's power to enter a contract while "illegality" looks to the general validity of a contract as a contract.

19. The pertinent definitional sections provide: "Air navigation facility" means any facility used in, available for use in, or designed for use in, aid of air navigation, including landing areas, lights, any apparatus or equipment for disseminating weather information, for signaling, for radio-directional finding, or for radio or other electrical communication, and any other structure or mechanism having a similar purpose for guiding or controlling flight in the air or the landing and take-off of aircraft.
49 U.S.C. § 1301(8) (1976).
"Landing area" means any locality, either of land or water, including airports and intermediate landing fields, which is used, or intended to be used, for the landing and take-off of aircraft, whether or not facilities are provided for the shelter, servicing, or repair of aircraft, or for receiving or discharging passengers or cargo.
49 U.S.C. § 1301(27) (Supp.1982).
In addition, it should be noted that both the 1942 and 1959 agreements required the City of Eastport's compliance with section 303 of the Civil Aeronautics Act of 1939. Section 303 was the predecessor to the present section 1349(a). The relevant language in both is the same.

constitutes the same in violation of section 1349(a).[20]

The option agreement between the City of Eastport and Pittston and its amendments also run afoul of common law principles. Tracing back to the early days of statehood, contracts against public policy have been declared by this Court to be void and unenforceable.

Illustratively, in *Groton v. The Inhabitants of Waldoborough,* 11 Me. 306 (1834) this Court considered an action brought to recover monies the Plaintiff had expended in purchasing at auction the office of Constable of the Town of Waldoborough. In affirming the dismissal of the case below, the Court termed the sale unlawful and against public policy, and concluded that "if the money has been paid in pursuance of an act immoral in itself, or in violation of the general laws of public policy, the party paying can have no action to reclaim it." *Id.* at 307.

The Court confronted a similar situation in *Weld v. Lancaster,* 56 Me. 453 (1868). That action involved a challenge to the validity of a contract for the carrying of the United States mail, entered into in derogation of a previous contract between the postal authorities and a third party. Noting that the second contract violated "the spirit of the law, which provides that mail contracts shall be open to fair competition and awarded to the lowest bidder . . .," the Court refused to uphold this agreement, concluding that it "upon its face shows an attempted fraud upon the government, and is in violation of the policy of the post office law." *Id.* at 457–58.

In short, to conclude that a contract is against public policy and therefore void breaks no new legal ground. *See Thacher Hotel, Inc. v. Economos,* 160 Me. 22, 25–26, 197 A.2d 59, 61 (1964); *Augusta Trust Company v. Augusta, Hallowell & Gardiner Railroad Company,* 134 Me. 314, 327, 187 A. 1, 7 (1936).[21]

Even without thus adverting to the violation of the federal statute, the option agreement and amendments contravene public policy. They attempt to convey to a private party an airport which, by virtue of its 1942 and 1959 agreements with the federal government, the City of Eastport expressly dedicated to the use and benefit of the public. If the option agreement and amendments thereto were to be validated, it would absolutely abrogate that public dedication. Such an abrogation violates public policy.

■ Pertinent also is the doctrine that a contract which operates to breach a prior contract involving a third party is illegal. *See Restatement (Second) of Contracts* § 194 (1981); 6A *Corbin on Contracts* § 1470 (1962); 15 W. Jaeger, *Williston on Contracts* § 1738 (3d ed. 1972).[22] If enforced, the option agreement not only would deprive the public of a facility developed for public use, but in so doing would breach the express terms of both the 1942 and 1959 grant agreements.

The term of the 1942 agreement was the "useful life" of the Eastport Airport, while the term of the 1959 agreement was the shorter of the airport's useful life or twenty years. The option agreement and amendments fell well within the twenty-year peri-

---

**20.** *See also Park v. Board of Aviation Trustees for City of Manchester,* 96 N.H. 331, 333, 76 A.2d 514, 516 (1950) (exclusive lease of airport held void under state statute tracking section 303 of 1938 Civil Aeronautics Act).

**21.** *See also County of Clark v. Bonanza No. 1,* 96 Nev. 643, 615 P.2d 939, 945 (Nev.1980); *Council v. Texas Gas Transmission Corporation,* 202 So.2d 916, 917 (Miss.1967); *McNutt v. Intratex Gas Company,* 600 S.W.2d 947, 949 (Tex.Civ.App.1980).

**22.** This doctrine in the law of contracts derives from the tort of interference with contractual relations. 6A *Corbin* § 1738. *See generally* 6. Alexander, *Commercial Torts* § 6.4 (1973); Note, *Tortious Interference with Contractual Relations in the Nineteenth Century: The Transformation of Property, Contract, and Tort,* 93 Harv.L.Rev. 1510 (1980). *See also MacKerron v. Madura,* 445 A.2d 680, 683 (Me. 1982); *Sawyer v. Bailey,* 413 A.2d 165, 168 (Me.1980).

od, thus only if the useful life of the airport had ended would Eastport's agreements with the federal government not be breached.[23]

Although the Superior Court did not expressly find that the airport's useful life continued through the time of the option agreement, such a finding is implicit in the court's conclusions regarding the nonabandonment of the facility by the City of Eastport.[24] The condition of the airport had deteriorated and flight activity was limited by the time the option agreement was signed; nonetheless, the record clearly reveals that *use* of the airport continued.[25] In light of the continued use of this facility for its fundamental purpose as an airport, we cannot conclude that by the time of the option agreement the useful life of the Eastport Airport had ended.

Because the airport's useful life continued, the option agreement with Pittston and the two amendments extending its implementation, if enforced, would have breached the City of Eastport's two grant agreements with the federal government. Apart from the conflict with federal law and violation of public policy, such breaches constitute an independent reason supporting the Superior Court's conclusion that the option agreement and amendments were null and void, and unenforceable.

On cross-appeal, the Plaintiffs challenge the Superior Court's conclusion that the City of Eastport has present authority to convey the airport to Pittston under the Revenue Producing Municipal Facilities Act, 30 M.R.S.A. § 4251 *et seq.* (1978 & Supp.1982–83). We need not decide whether this conclusion was correct. It was in no way necessary to the Superior Court's determination of this controversy. As surplusage, this finding is without legal effect.

---

**23.** Of course, even if the option agreement and amendments fell outside the twenty-year period, they would conflict with the 1942 grant agreement unless the airport's useful life had ended.

**24.** In deciding that the City had not abandoned the airport—an issue integral to the Superior Court's *ultra vires* analysis—the court noted

Therefore, the entry is:

Appeal denied.

Cross-appeal denied.

Judgment affirmed.

All concurring.

---

that the airport was licensed through this period and that use of the facility, if sporadic, continued.

**25.** In fact, the record reveals that officials and counsel of the Pittston Company flew in and out of the Eastport Airport between 1973 and 1980.