Filed 12/23/21  Medical Benefits Admin. v. Nivano Physicians CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| MEDICAL BENEFITS ADMINISTRATION, INC. et al., | C091841 |
| Plaintiffs and Appellants, | (Super. Ct. No. CU17082413) |
| v. | |
| NIVANO PHYSICIANS, INC., | |
| Defendant and Appellant. | |

Defendant and appellant Nivano Physicians, Inc. (Nivano) appeals from the trial court's decision to enforce a settlement agreement between Nivano and plaintiffs and respondents Medical Benefits Administration, Inc., and its founder and president Keely L. Smith (collectively MBA).  On appeal, Nivano contends the trial court erred when it enforced the settlement agreement despite assuming it to be illegal.  We agree with Nivano, and therefore reverse the judgment.  Based on that holding, we need not and do not reach other claims raised by Nivano, nor do we reach MBA's cross-claim.

1

**FACTS AND PROCEEDINGS**

MBA provided professional billing and management services for physicians and physician groups. Nivano, an independent practice association, contracted with MBA to provide administrative and management services.[1] Under this agreement, Smith, who was the founder and president of MBA, served as Nivano's chief executive officer (CEO), a role she held until October 2016.

*LuminX Agreement*

In 2004, MBA purchased the right to use a piece of healthcare software known as LuminX from Acclamation Systems, Inc., which in turn was purchased by Ebix, Inc. (Ebix) in or around 2010. MBA used LuminX to perform a number of essential functions for Nivano's operations. MBA paid Ebix $237,415 for the right to use LuminX, and further agreed to pay Ebix a monthly "maintenance fee" in connection with MBA's continued use of the software.

The agreement to purchase the right to use LuminX (LuminX agreement) authorized MBA to use LuminX for "its internal business purposes but not for the internal purposes of third parties or on any timesharing, renting, or service bureau basis." The LuminX agreement specifically prohibited and made "void" any efforts by MBA to sublicense or otherwise profit from Ebix's property. It provided: "Licensee [MBA] acknowledges that the Software (including all methods, concepts or techniques utilized therein) and its related documentation are commercially valuable to [Ebix] and/or its suppliers and are treated as confidential, proprietary and containing of trade secrets. Except for the rights expressly granted to Licensee [MBA] hereunder, no right in or title to the Software, or any intellectual property rights therein or associated therewith, shall be deemed to have been vested in or transferred to Licensee [MBA] under the terms of

---

[1] Nivano was known as Sierra Nevada Medical Associates, Inc. until 2017.

the Agreement.  All title to and ownership of the Software, and the intellectual property rights therein or associated therewith, remain with [Ebix] and its suppliers.  Subject to the terms protecting Confidential Information, Licensee [MBA] acknowledges that [Ebix] may use any ideas, concepts, modifications and information arising out of the Services and relating to [Ebix] Software in the development and distribution of new products, enhancements or applications."  The agreement defined " 'Software' " to refer to any "software application or suite of applications licensed and delivered to Licensee [MBA] hereunder, including any New Release or custom development software, which may be delivered to Licensee [MBA] either with the initial delivery of the Software or at any time thereafter."

The LuminX agreement covered MBA's use of LuminX when MBA was administering and managing Nivano; MBA had the right to assign access to the LuminX software to up to 25 users.

MBA's in-house programmers worked with Ebix personnel to customize the base software package to suit Nivano's specific business needs.  Smith acknowledged that the "customizations" or "modules" provided by MBA did not enhance, change, or involve the LuminX software itself, while Nivano acknowledged that LuminX would not be able to function as required to suit Nivano's needs without MBA's additions to the base software.

*Licensing Agreement*

In 2015 and 2016, Nivano converted the MBA employees responsible for performing professional services for Nivano to Nivano employees.  This change did not affect the services being delivered.  However, Nivano began to pay Ebix directly (rather than through MBA) for the monthly maintenance fees associated with Nivano's use of the base LuminX software package.  Neither Ebix nor Nivano raised any concerns with this change.  Nivano employees worked directly with Ebix to resolve technical issues.

3

Smith remained Nivano's CEO until October 2016, when she was replaced by Dr. Venu Kondle, who was a Nivano shareholder and was not affiliated with MBA. According to Nivano, around this time, MBA reiterated to Nivano that MBA created, developed, and owned LuminX, and that Nivano would need to contract with MBA if it wanted to continue using LuminX. MBA, on the other hand, contends that Nivano simply realized that MBA might decide to refuse to allow it to continue using LuminX. Under either version, due to the costs associated with moving to a different software and hardware platform, and in order to protect Nivano's ability to continue using the LuminX software, Kondle insisted that Nivano contract with MBA such that Nivano would pay MBA monthly fees in exchange for continued delivery of services. MBA did not inform Kondle or anyone else at Nivano that MBA neither created nor owned LuminX. At all times, LuminX was created and owned by Ebix.

Nivano's counsel prepared and presented to MBA a "Software and Hardware Licensing Agreement" (licensing agreement) regarding LuminX.[2] MBA did not draft the text of the agreements, but both MBA and Nivano reviewed and revised the licensing agreement until they agreed on a version to execute.

On February 16, 2017, while the parties were negotiating the licensing agreement, Nivano employee Jami Lopez e-mailed Ebix regarding a possible update to the LuminX program. Mark Brown, Ebix's vice-president, responded that Ebix's contract was with MBA, and he wanted to gain a better understanding of Nivano's use of LuminX. Lopez e-mailed David Scribner, Nivano's general counsel: "I reached out to Ebix (they own Luminex- our current product) in regards to system upgrades, etc. [¶] I spoke to the

---

[2] Nivano's counsel also prepared an independent contractor agreement for Smith in her individual capacity, which recognized that Smith "desire[d] to contract with [Nivano] to provide insight on project development, contracting, network expansion and membership growth"; the independent contractor agreement provided that Smith was to be paid $10,000 per month for her services.

4

rep[resentative], Mark Brown, this morning and he was very confused as he had never heard of [Nivano] . . . . I am concerned that there is a potential problem given that [MBA] is the owner of the license and he made a remark in regards to leasing agreements in reference to [MBA's] contract. With MBA no longer involved, I do not know what the legal implications are. [¶] I wanted this on your radar immediately."

Scribner forwarded the e-mail chain to another Nivano employee, recognizing that Nivano "will need all LuminX licensing paperwork" in MBA's possession to determine if there was any "exposure" to Nivano. That employee e-mailed Smith with concerns over MBA's agreement with Ebix, and he asked for a copy of that contract "to see how to resolve any misunderstandings." Smith did not provide MBA's contract with Ebix to Nivano.

On February 21, 2017--made retroactive to January 2017--MBA and Nivano executed the licensing agreement.[3] The licensing agreement named Smith, doing business as MBA, as the " 'Licensor' " and Nivano as the " 'Licensee,' " and it stated that MBA "has created and developed" LuminX. The licensing agreement granted Nivano a license to use LuminX and established a monthly fee for use of LuminX. It further stated: "Licensor further represents and warrants that it has no actual knowledge that the Software [LuminX] infringes any valid rights of any third party."

Smith testified at trial that she "didn't like the term of being called a licensor, because it was for the use of my systems, not a license. I never billed for a license. I didn't sell a license. They had the right to use my systems for a dollar per member per month." Smith also stated that she did not believe MBA was prohibited from licensing LuminX to Nivano because MBA had purchased the licenses. She did not voice any concerns over MBA being characterized as a licensor to Nivano.

---

[3] Smith, in her individual capacity, and Nivano also executed the independent contractor agreement. That agreement is not at issue in this appeal.

Scribner testified Smith told him MBA could license LuminX, and he "had a sense" after conversations with Smith that Ebix may have been a hosting service for LuminX, the program he was under the impression that MBA owned.

Nivano continued to use LuminX under the licensing agreement until December 31, 2017, after which time Nivano stopped using LuminX because it no longer served Nivano's business needs.

Brown testified that Ebix was not aware MBA had sublicensed LuminX to Nivano, and MBA was not permitted to do so.

*Lawsuit and Settlement Agreement*

For several months before September 2017, Nivano did not make payments under the licensing agreement. According to Nivano, it simply could not afford to make the payments. According to MBA, Kondle was involved in a legal dispute with Nivano's physician-shareholders, believed MBA might be funding their litigation efforts, and sought to "choke off" the fees Nivano was paying to MBA. On September 6, MBA filed the instant lawsuit, alleging causes of action against Nivano for breach of the licensing agreement and conversion, and seeking damages for the missed payments.[4] MBA also filed an application for writ of attachment against Nivano, which was withdrawn following the parties' subsequent settlement agreement.

Nivano contacted MBA soon after it filed suit and offered to settle the claims; the parties reached a settlement agreement on September 15. Under that agreement, Nivano agreed to pay MBA for the right to use software and hardware "owned" by MBA. Pursuant to the agreement's terms, Nivano agreed to pay MBA $50,000 on September 15,

---

[4] MBA also sought damages for payments Nivano failed to make under Smith's independent contractor agreement.

2017, and $70,091.50 on October 1 and October 15.[5]  The settlement agreement did not limit Nivano's future obligations to make payments owed under the licensing agreement.

Nivano timely issued the $50,000 check to MBA, but failed to make settlement payments on October 1 or October 15.  Nivano asserted that it did not make the payments because it was experiencing financial difficulties.  MBA, on the other hand, claimed that Nivano also said it would not make the payments because of alleged fraudulent conduct by MBA that predated the execution of the settlement agreement.  According to MBA's counsel, Nivano's chief administration officer indicated that he was aware of MBA's purported misconduct well in advance of the execution of the settlement agreement.

Nivano asserts that it became aware of MBA's inability to license LuminX after it entered into the settlement agreement, in December 2017 or January 2018.

*Plaintiffs' First Amended Complaint*

On October 18, 2017, MBA filed its first amended complaint.  The amended complaint alleged the same causes of action that were alleged in the original complaint, and it added causes of action for breach of the terms of the settlement agreement and for fraud in inducing MBA to enter into the settlement agreement without any real intention to perform.

In January 2018, Nivano answered the first amended complaint, and it asserted the affirmative defense--among others--that the licensing agreement and settlement agreement advanced by MBA were illegal.

*Plaintiffs' Motion to Enter Judgment Pursuant to the Settlement Agreement*

In July 2019, at the close of discovery and approximately one month before trial, MBA filed a motion for entry of judgment under Code of Civil Procedure section 664.6 and a motion for judgment on the pleadings, requesting that the trial court enter judgment

---

[5]  Nivano also agreed to pay Smith $50,000 on September 15, 2017, related to missed payments under the independent contractor agreement and made that payment.

7

pursuant to the settlement agreement.[6]  Nivano opposed the motion; it argued the settlement agreement could not be enforced because it had been induced by MBA's fraudulent misrepresentations that it created and owned LuminX.  Nivano also moved for terminating sanctions based on MBA's purported fraud in connection with statements to Nivano that MBA "created" and "developed" LuminX.

The trial court deferred ruling on MBA's motion for entry of judgment pursuant to the terms of the settlement agreement until after presentation of the evidence because there were disputed facts related to the enforceability of the settlement agreement. Specifically, the court recognized Nivano's contention that the settlement agreement and underlying licensing agreement were procured through fraud and were illegal.  The court denied MBA's motion for judgment on the pleadings.

After the close of evidence at trial but before the jury was instructed, the trial court granted MBA's motion for entry of judgment after hearing argument.  The court concluded that the parties had entered into a valid and binding settlement agreement; it later clarified that Nivano could continue to challenge the validity of the agreements *underlying* the settlement agreement, but not whether a valid settlement agreement was formed by the parties.  The court further determined that Nivano had agreed to pay MBA and Smith $240,183 for amounts due under the licensing and independent contractor agreements, and the contemplated settlement payment would not limit Nivano's obligations as to future payments under the licensing agreement, which Nivano promised to pay.

With respect to Nivano's defense of illegality, the trial court assumed the illegality of the settlement agreement because it sought enforcement of the licensing agreement, which purported to sublicense LuminX to Nivano in violation of the agreement between

---

[6]  Further undesignated statutory references are to the Code of Civil Procedure.

8

MBA and Ebix. However, the court concluded that, "in weighing the equities, . . . the settlement agreement . . . should be enforced in order to avoid unjust and unwarranted enrichment to Nivano, which has received many, if not all, of the benefits under the underlying [licensing] agreement and [independent contractor] agreement and which also received some of the benefits under the settlement agreement, all without full payment to MBA/Smith for the same."

The trial court also concluded Nivano had failed to establish that its consent to the settlement agreement was induced or procured by MBA's knowing fraud or negligent misrepresentation. Finding entry of judgment pursuant to section 664.6 for only a portion of the lawsuit procedurally permissible, the court entered judgment in favor of MBA in the amount of $140,183--the total amount Nivano agreed to pay MBA pursuant to the settlement agreement for payments missed under the licensing agreement on October 1 and 15, 2017.

The trial court then ruled that MBA would need to present to the jury its claims for remaining amounts owed under the settlement agreement, and that Nivano would be able to proceed with its defenses to the enforceability of the underlying licensing agreement as well as its own affirmative claims of fraud against respondents.

*Verdict and Posttrial Procedural History*

After the court's ruling that the settlement agreement was enforceable, the parties proceeded with closing arguments as to the remaining issues in the case. The jury returned a verdict in MBA's favor on its claims of breach of the settlement agreement, and it awarded respondents an additional $250,001 on those claims.[7] The jury also issued a verdict in favor of MBA as to Nivano's cross-claims.

---

[7] This verdict included a $1 damages award for Nivano's breach of the independent contractor agreement.

9

After the verdict, the trial court addressed the affirmative defense raised by Nivano that the licensing agreement was an illegal contract that was unenforceable as a matter of law and public policy. The court again assumed without deciding that the licensing agreement was illegal because it purported to sublicense the LuminX software to Nivano in violation of the LuminX agreement. The court further assumed that the settlement agreement was illegal in part because it sought to enforce the illegal licensing agreement.

Nevertheless, the trial court concluded, "in weighing the equities," that the settlement agreement and the underlying licensing agreement should be enforced. The court concluded that Ebix was a commercial entity capable of taking actions necessary to protect its rights, and the policy of the laws at issue was to protect the rights of Ebix, not Nivano; therefore, Nivano was not a party directly in need of the law's protection with regard to the illegality of the licensing agreement. The court also concluded that MBA performed according to the agreements at issue, Nivano willingly accepted the benefits of those agreements, and Nivano would be unjustly enriched if the licensing agreement were not enforced. Further, the court concluded that the licensing agreement and settlement agreement were not malum in se--the kind of illegality that would render them void--but rather were malum prohibitum and only voidable depending on the factual context and the public policies involved. Finally, the court recognized that the illegal agreements were no longer in effect, and therefore there was no need to protect the public from the future consequences of the illegal agreements.

The trial court also ruled against Nivano on the remaining issues and entered judgment against Nivano on March 5, 2020. Nivano timely appealed. The case was fully briefed on April 21, 2021, and assigned to this panel for review on April 30, 2021. The parties argued the case on November 17, 2021.

## DISCUSSION

### I

*Enforcing Illegal Settlement Agreement Through Equity*

Nivano contends the trial court erred when it enforced the settlement agreement, which the court assumed to be illegal, by applying inapplicable equitable exceptions to the general rule that illegal contracts are unenforceable. MBA disagrees; it generally asserts that the various exceptions to the general rule "eviscerate[ ] virtually every one of [Nivano's] arguments," and the court properly used its powers in equity to enforce the settlement agreement. As we next explain, we conclude the trial court erred by enforcing the illegal settlement agreement.

A. *Standard of Review*

A trial court's determination whether a contract is void and unenforceable because of illegality is a question of law that we review de novo. (*McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 343 (*McIntosh*).) MBA agrees that whether a contract is illegal is a question of law, but it contends that, where there are disputed facts in connection with the trial court's determination of illegality or enforceability, we review the trial court's decision for substantial evidence. (*Timney v. Lin* (2003) 106 Cal.App.4th 1121, 1126.) But here, as in *Timney*, we are not reviewing the trial court's factual determinations, but rather its legal conclusions based on extrinsic evidence that was not in conflict. (*Ibid.*) Accordingly, our review is de novo.

B. *Illegal Contract Principles*

We begin with the issue of whether the settlement agreement was illegal. " 'The illegality of contracts constitutes a vast, confusing and rather mysterious area of the law.' [Citation.] Nevertheless, enacted as part of the original Field Codes, the contractual doctrine of illegality has been codified in this state since 1872, and appears as Civil Code section 1608: 'If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void.' Thus, where

11

the illegal consideration goes to the whole of the promise, the entire contract is illegal." (*McIntosh*, *supra*, 121 Cal.App.4th at p. 344.) "Unlawful consideration is that which is: '1. Contrary to an express provision of law;  [¶]  2. Contrary to the policy of express law, though not expressly prohibited; or,  [¶]  3. Otherwise contrary to good morals.'  (Civ. Code, §§ 1607, 1667.)  The concept of unlawful consideration embraces a promise to refrain from wrongful conduct directed at the promisee or a third person." (*Kallen v. Delug* (1984) 157 Cal.App.3d 940, 949.)

Courts generally will not enforce an illegal contract.  (*Wong v. Tenneco, Inc.* (1985) 39 Cal.3d 126, 135 [" 'No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out . . .' ']; *Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199, 218 (*Tri-Q*); *Lewis & Queen v. N.M. Ball Sons* (1957) 48 Cal.2d 141, 150 ["the courts generally will not enforce an illegal bargain or lend their assistance to a party who seeks compensation for an illegal act"]; *Kashani v. Tsann Kuen China Enterprise Co.* (2004) 118 Cal.App.4th 531, 540 [contract contrary to public policy will not be enforced].)  "Rather, the parties will be left where they are found when they come to a court for relief." (*Kelton v. Stravinski* (2006) 138 Cal.App.4th 941, 949.)

This rule is applied to promote a societal recognition that certain types of transactions should be discouraged.  (*Moran v. Harris* (1982) 131 Cal.App.3d 913, 918.) " '[W]hen the evidence shows that . . . [a party] in substance seeks to enforce an illegal contract or recover compensation for an illegal act, the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids.'  [Citation.]  These rules are intended to prevent the guilty party from reaping the benefit of his wrongful conduct, or to protect the public from the future consequences of an illegal contract." (*Tri-Q*, *supra*, 63 Cal.2d at p. 218.)

C.  *Illegality of the Settlement Agreement*

Multiple authorities have recognized contracts that operate to breach a prior contract involving a third party are illegal.  (See, e.g., Rest. 2d Contracts, § 194, pp. 93-94 ["A promise that tortiously interferes with performance of a contract with a third person is . . . unenforceable on grounds of public policy"]; 7 Williston on Contracts (4th ed. 2021) § 16:14 ["In general, a bargain which contemplates a wrong to a third person, or to undefined members of the public, whether trespass, breach of trust or fraud, is illegal"]; *American Trust Co. v. California Western States Life Ins. Co.* (1940) 15 Cal.2d 42, 66 ["The evidence and findings bring the case within the general principle that an *agreement to defraud third persons* is illegal and void"]; *Moody v. Newmark & Edwards* (1898) 121 Cal. 446, 448 [an agreement that violates the terms of another contract is void as against public policy]; *Roberts v. Criss* (2d Cir. 1920) 266 F. 296, 301 [refusing to enforce contract requiring defendant to breach contract with third party]; *Lehigh v. Pittston Co.* (Me. 1983) 456 A.2d 355, 361 [a contract that operates to breach a prior contract involving a third party is illegal].)

In *Lehigh v. Pittston Co.*, the Supreme Judicial Court of Maine observed that "[t]his doctrine in the law of contracts derives from the tort of interference with contractual relations."  (*Lehigh v. Pittston Co.*, *supra*, 456 A.2d at p. 361, fn. 22.)  "The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126.)  The tort is shown where " ' " 'the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a

13

result of his [or her] action.' " ' " (*Jenni Rivera Enterprises, LLC v. Latin World Entertainment Holdings, Inc.* (2019) 36 Cal.App.5th 766, 782.)

MBA asserts that it is not necessary for us to review the trial court's assumption that the licensing agreement and consequently the settlement agreement--which sought to enforce the licensing agreement--are illegal, although it contends the agreements were legal. MBA first argues the licensing agreement was legal because, if an agreement involving one contracting party's breach of its obligations owed to a third party in a separate contract were illegal: "[T]here would certainly be many hundreds of cases involving such contracts and specifically holding so." In light of the authorities we discussed *ante* and without further elaboration by MBA, we are not persuaded by this argument.

Moreover, MBA points us to no authority stating that such a contract is legal and enforceable. It notes that an intentional breach of a contract has been described as a "morally neutral act" (*Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 106-115), and therefore the licensing agreement cannot be seen as an act of moral turpitude. But whether the act of entering into a contract that breaches another contract involves moral turpitude does not address the issue of whether such a contract is illegal. A lawful contract requires lawful consideration. Here, MBA's consideration in the licensing agreement was the sublicense of LuminX to Nivano in knowing and willful breach of MBA's contractual obligations to Ebix.[8] Accordingly, we conclude the licensing agreement was illegal. Thus the settlement agreement, which purported to enforce the illegal licensing agreement, is also illegal. (See *Hooper v. Barranti* (1947) 81

---

[8] Nivano further contends that the licensing agreement violates the Uniform Trade Secrets Act (Civ. Code, § 3426, et seq.). Based on our conclusion that the licensing agreement is illegal, we need not address the separate question of whether it violated that statute as well.

Cal.App.2d 570, 576 ["The test whether a demand connected with an illegal transaction is capable of being enforced is whether the plaintiff requires the aid of the illegal transaction to establish his case. If the plaintiff cannot establish his case without showing that he has broken the law, the court will not assist him, whatever his claim in justice may be upon the defendant"]; 1 Witkin, Summary of Cal. Law (11th ed. 2020) Illegal Contract Is Foundation of Suit, § 431 ["Even though the action is not brought directly to enforce the terms of the illegal agreement, if the agreement is nevertheless the foundation of the suit, or the claim cannot be established except by proving the illegal agreement, recovery is denied"].)

D. *Exceptions to the General Rule*

Although the general rule against enforcing illegal contracts appears clear-cut, courts have carved out a variety of exceptions to that rule "[b]ecause of the harsh results that might be visited on innocent parties to a contract when their agreement is voided for illegality." (*McIntosh*, *supra*, 121 Cal.App.4th at p. 347.) For instance, the mere appearance of illegality somewhere in the transaction does not necessarily require that courts withhold relief under the terms of the contract unless the parties are truly in pari delicto. (*Tri-Q*, *supra*, 63 Cal.2d at p. 218.) "At its most fundamental level, the exception allows an illegal contract to be enforced 'so long as the party seeking its enforcement is less morally blameworthy than the party against whom the contract is being asserted, and there is no overriding public interest to be served by voiding the agreement.' " (*McIntosh*, at p. 347.) The *Tri-Q* court adopted a formulation of the in pari delicto doctrine articulated in *Norwood v. Judd* (1949) 93 Cal.App.2d 276: " '[T]he courts should not be so enamored with the Latin phrase "in pari delicto" that they blindly extend the rule [requiring courts to withhold relief under the terms of an illegal contract or agreement that is violative of public policy] to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the

15

rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.' " (*Tri-Q*, at pp. 218-219, italics omitted.)

As stated in *Tri-Q*, *supra*, 63 Cal.2d at page 219: " 'A bargain may be illegal by reason of the wrongful purpose of one or both of the parties making it. This is true even though the performances bargained for are not in themselves illegal and even though in the absence of the illegal purpose the bargain would be valid and enforceable. A party who makes such a bargain in furtherance of his wrongful purpose can not enforce it, *even though it is enforceable against him by the other party if the latter is innocent of such a purpose.*' " As the *Tri-Q* court indicated, other courts have held that where the parties are not in pari delicto, there are circumstances in which the *party whose fault is slight* may be granted some relief. (*Severance v. Knight-Counihan Co.* (1947) 29 Cal.2d 561, 569 (*Severance*) [fact that parties to an executed illegal contract are not equally at fault may justify recovery by party whose fault was slight of what he has rendered as performance of the contract]; *Watson v. Poore* (1941) 18 Cal.2d 302, 312; *McAllister v. Drapeau* (1939) 14 Cal.2d 102, 112 ["where one party is involved to some extent in the illegality, but where the second party is grievously at fault and the first party only slightly at fault the court will allow recovery of moneys paid by the first party under the executory contract"].)

Subsequent to *Norwood*, courts have, "depending on the facts, carved out exceptions to the statutory and judicial language that illegal contracts are void and unenforceable." (*Kashani v. Tsann Kuen China Enterprise Co.*, *supra*, 118 Cal.App.4th at pp. 541-542.) As stated in *Kashani*: "[C]ases have enforced contracts that involve technical violations of occupational licensing and building permit laws (see, e.g., *Felix v. Zlotoff* (1979) 90 Cal.App.3d 155, 162-163; *Vitek, Inc. v. Alvarado Ice Palace, Inc.*

16

(1973) 34 Cal.App.3d 586, superseded by Bus. & Prof. Code, § 7031, subd. (d); 3 Schwing, [Cal. Affirmative Defenses (2d ed. 1996)] § 37:6, pp. 22-23), revenue raising provisions, or 'when the Legislature enacts a statute forbidding certain conduct for the purpose of protecting one class of persons from the activities of another.' (*Lewis & Queen v. N.M. Ball Sons*, *supra*, 48 Cal.2d at p. 153 ['a member of the protected class may maintain an action notwithstanding the fact that he has shared in the illegal transaction']; see *Yuba Cypress Housing Partners, Ltd. v. Area Developers* (2002) 98 Cal.App.4th 1077, 1082.)" (*Kashani,* at pp. 558-559.)

In *Asdourian v. Araj* (1985) 38 Cal.3d 276 (*Asdourian*), superseded on other grounds by Business and Professions Code section 7031, our Supreme Court enforced a contract in which the plaintiff performed three remodeling projects for a real estate investor but had technically violated a contracting law because the contracts were not in writing and because the plaintiff accepted and performed the projects in his own name, rather than the name of his sole proprietorship. The court recognized that, while the contract was illegal, "[i]n compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' " (*Id.* at p. 292.) In such compelling cases, " ' "the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts." ' " (*Ibid.*; *California Physicians' Service v. Aoki Diabetes Research Institute* (2008) 163 Cal.App.4th 1506, 1516.)

In enforcing the contract in that case, the *Asdourian* court recognized in part that the agreements were not malum in se--immoral in character, inherently inequitable, designed to further a crime or obstruct justice, or otherwise " 'intrinsically illegal' "--but rather malum prohibitum--prohibited by statute. (*Asdourian*, *supra*, 38 Cal.3d at p 293.) Accordingly, the contracts were voidable, depending on the factual context and the public policies involved. (*Ibid.*; see *McIntosh, supra*, 121 Cal.App.4th at p. 344, fn. 10 [malum

17

prohibitum contracts may be enforceable if the parties were not in pari delicto]; *Vitek, Inc. v. Alvarado Ice Palace, Inc., supra*, 34 Cal.App.3d at p. 593 [malum in se agreements are "absolutely void," while malum prohibitum contracts are void or voidable depending on the nature and effect of the prohibited act]; *Russell City Energy Co., LLC v. City of Hayward* (2017) 14 Cal.App.5th 54, 70-71.)  Courts have recognized, however, that the distinction between contracts that are malum in se and those that are merely malum prohibitum is " 'somewhat artificial.' " (*McIntosh*, at p. 344, fn. 10; *Russell City Energy,* at p. 70, fn. 9.)

Nivano contends that after assuming the licensing agreement and settlement agreement purporting to enforce it were illegal, the trial court should have declared them unenforceable as against public policy and not considered the various exceptions to the general rule that illegal contracts are unenforceable.  It asserts that these exceptions are limited to cases in which the illegality involved a technical violation of occupational licensing and building permit laws, violations of revenue raising provisions, or in instances in which the Legislature has enacted a statute forbidding certain conduct for the purpose of protecting one class of persons from the activities of another. (*Kashani*, *supra*, 118 Cal.App.4th at pp. 558-559.)

We disagree with Nivano that the generally stated exceptions to the rule that illegal contracts are unenforceable are necessarily restricted only to the types of cases described in *Kashani*.  While we ultimately conclude that the exceptions do not apply here, and therefore the settlement agreement should not be enforced to the extent that it purports to enforce the illegal licensing agreement, we do not conclude that the exceptions would not have been applicable here on slightly different facts.

E. *In Pari Delicto*

As *Tri-Q* instructs, we should not apply the general rule that courts do not provide relief for parties to an illegal contract unless they are truly in pari delicto, or where " 'the public cannot be protected because the transaction has been completed, where no serious

18

moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff.' " (*Tri-Q*, *supra*, 63 Cal.2d at pp. 218-219.)

We begin by recognizing that Nivano no longer uses LuminX and the licensing agreement is no longer operative, and therefore protection of the public is not a consideration in this transaction. Nivano contends that this factor favors it because, by enforcing the agreement, the trial court did nothing to deter MBA's bad acts and indeed may have encouraged similar conduct in the future, thereby undermining judicial integrity. But while other public policy factors may militate in favor of finding an illegal agreement unenforceable, the licensing agreement has been completed, and there is no need to protect the public from its continued effects.

Nivano next contends that MBA's conduct in the transaction involved serious moral turpitude, and its conduct constituted the greatest moral fault. " '[M]oral turpitude' is an 'elusive concept incapable of precise general definition' " (*People v. Castro* (1985) 38 Cal.3d 301, 333 (conc. & dis. opn. of Bird, C.J.)), but our Supreme Court has defined it as "contrary to honesty and good morals" (*Stanford v. State Bar* (1940) 15 Cal.2d 721, 728), or " '[a]n act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man' " (*In re Boyd* (1957) 48 Cal.2d 69, 70). "Whether the facts as found constitute moral turpitude is a question of law to be determined by this court." (*In re Strick* (1983) 34 Cal.3d 891, 901.)

Here, MBA entered into the licensing agreement in express violation of its obligations under the LuminX agreement. Although at trial Smith acknowledged that she did not feel entirely comfortable with MBA being labeled as "licensor," her purported discomfort did not prompt her to raise the issue with Scribner while the parties were negotiating the agreements, seek the opinion of outside counsel to determine whether the licensing agreement was legal, ask Ebix for its opinion regarding MBA's ability to

sublicense LuminX, or send the LuminX agreement to Nivano for its legal opinion. Instead, MBA forged ahead with the licensing agreement, while continuing to represent itself as that software's creator and owner, which was clearly not the case.

However, we are mindful, as noted *ante*, that our Supreme Court has characterized an intentional breach of contract as a "morally neutral act." (*Freeman & Mills, Inc. v. Belcher Oil Co.*, *supra*, 11 Cal.4th at p. 106.) The licensing agreement did not involve any furtherance of criminal activity, and the jury found that MBA did not fraudulently induce Nivano to enter into the licensing agreement. Indeed, there is evidence suggesting that MBA had reason to believe Nivano had sufficient information available to it to learn the nature of the LuminX agreement, had it chosen to do so. Thus, even if MBA's conduct involved some amount of moral turpitude, we do not agree that MBA's conduct involved such "serious moral turpitude" that it must not under any circumstances be afforded relief from the courts.

Nevertheless, we conclude that MBA is not the party less responsible for entering into the illegal licensing agreement such that the settlement agreement should be enforced in MBA's favor. The parties disputed at trial who knew what, and when; however, as we have discussed, both parties had information available to them that would have allowed them to determine Ebix's rights related to the licensing agreement. MBA, as a party to the LuminX agreement, either knew or should have known that it was not entitled to sublicense LuminX to Nivano. Similarly, Ebix explained to Nivano mere days before MBA and Nivano entered into the licensing agreement that "[Ebix's] contract is with MBA." While Nivano argued that it remained ignorant of the nature of the LuminX agreement until December 2017 or January 2018, it had the opportunity to respond to Brown's February 16, 2017, e-mail and clarify the nature of MBA's agreement with Ebix; the evidence does not show that it did so.

Moreover, there is some evidence that the licensing agreement favored both parties. Nivano was able to use the licenses without having purchased them, and while

20

paying only the maintenance fees. Further, witnesses for Nivano recognized that Nivano could not simply obtain an "out-of-the-box" LuminX package from Ebix, given the necessary customizations the program required to satisfy Nivano's business needs. Smith acknowledged that, had MBA not been entitled to sublicense LuminX as it did, it would have lost an opportunity to enter into a lucrative agreement with Nivano, which was worth as much as $2 million. Accordingly, it was in the interests of both parties to enter into the licensing agreement.

Under no reasonable interpretation of the facts can we conclude that MBA was significantly less at fault in this transaction than Nivano. Accordingly, there is no basis under which MBA should be permitted to enforce the licensing agreement. A party in pari delicto, at equal fault, is not entitled to enforce an agreement. (*Severance*, *supra*, 29 Cal.2d at p. 569; *Watson*, *supra*, 18 Cal.2d at p. 312; *McAllister*, *supra*, 14 Cal.2d at p. 112; *Tri-Q*, *supra*, 63 Cal.2d at p. 219.)

Further, we do not agree with MBA that principles of unjust enrichment compel us to enforce the licensing agreement. MBA contends that Nivano obtained all of the benefit for which it had bargained under the licensing agreement, even though it refused to pay MBA for most of the agreement's duration. We acknowledge that Nivano bargained for and was able to continue using LuminX until such time as it was able to incorporate alternative software to satisfy its business needs, and Nivano did not pay plaintiffs for the use of LuminX for several months before September 2017. However, enforcing the licensing agreement would result in a substantial windfall for MBA, which was not legally entitled to profit by sublicensing LuminX and were therefore not entitled to earn *anything* under the licensing agreement. Thus, this case is unlike *Asdourian*, *supra*, 38 Cal.3d 276, in which the defendant obtained the benefit of multiple remodeling projects performed by the plaintiff, who, but for a technical violation of a licensing statute, was qualified to and did perform under the contracts. (*Id.* at p. 282.) The licensing agreement here was fundamentally distinguishable. This case does not involve

21

a minor statutory violation and performance by the plaintiff. Accordingly, unlike the situation in *Asdourian*, where declining to enforce the contract would be harsh in proportion to the character and extent of illegality, there is no such harshness here. MBA did not own a license that it was authorized to sublicense, and its performance under the contract only amounted to profiting from a product from which it was expressly unauthorized to profit.

We recognize that if we decline to enforce the licensing agreement, Nivano will have benefitted from using LuminX without paying the full amount to MBA owed under the agreement. But MBA had no right to *any* money from Nivano's use of LuminX, and knew or should have known that fact. We do not view that result as disproportionately harsh given the nature and character of the illegality of the contract: sublicensing a product that MBA had neither the right to sublicense nor profit from. At the time of the licensing agreement, MBA neither maintained nor used LuminX for or on behalf of Nivano. Instead, Ebix maintained LuminX and Nivano's employees operated and used it.

Aside from disagreeing that it would be unjustly enriched if the licensing agreement were enforced, MBA does not directly address any of the applicable factors. Rather, it contends generally that the exceptions to the rule prohibiting enforceability of illegal contacts "eviscerate[] virtually every one of [Nivano's] arguments." MBA does not analyze any of the exceptions to the general rule, preferring platitudes such as "Nivano's arguments are circular and only lead it back to arguing with the trial court's factual determinations." But MBA does not identify any specific factual determinations made by the trial court that compel us to conclude that the licensing agreement must be enforced.

We have considered and applied the relevant factors for determining whether the parties here are truly in pari delicto, and we conclude that they are. Accordingly, this is not a case where the illegal contract will be enforced to avoid unjust enrichment to a defendant or a disproportionately harsh penalty on MBA (see *Asdourian*, *supra*, 38

22

Cal.3d at p. 292), or a case in which a party only slightly at fault should be permitted to recover against a party bearing the substantially greater share of moral fault (e.g., *Severance*, *supra*, 29 Cal.2d at p. 569). Because we conclude that the licensing agreement is unenforceable based on its illegality that contravenes public policy and the settlement agreement seeks in turn to enforce that unenforceable licensing agreement, the settlement agreement is not enforceable and we need not reach Nivano's remaining arguments.

## DISPOSITION

The judgment is reversed. Nivano is awarded its costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

/s/
Duarte, J.

We concur:

/s/
Hull, Acting P. J.

/s/
Mauro, J.